IN THE CASE OF


UNITED STATES, Appellee

v.

Guillermo A. QUINTANILLA, Staff Sergeant
U.S. Army, Appellant

No. 00-0499

Crim. App. No. 9601468

United States Court of Appeals for the Armed Forces

Argued December 5, 2000

Decided October 19, 2001

    EFFRON, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and GIERKE and BAKER, JJ., joined.  SULLIVAN,
S.J., filed an opinion concurring in part and dissenting in
part.

<u>Counsel</u>


For Appellant:  <u>Mr. Craig W. Carlson</u> and <u>Captain Stephanie L. Haines</u>
    (argued); <u>Lieutenant Colonel David A. Mayfield</u> and <u>Major Mary M. McCord</u>
    (on brief).


For Appellee:  <u>Captain Karen J. Borgerding</u> (argued); <u>Lieutenant Colonel Edith</u>
    <u>M. Rob</u> and <u>Major Anthony P. Nicastro</u> (on brief).



Military Judge:  Keith H. Hodges



<u>THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE PUBLICATION</u>.

United States v. Quintanilla, No. 00-0499/AR


Judge EFFRON delivered the opinion of the Court.

INDEX

PROCEDURAL HISTORY [3]


PART A. JUDICIAL DISQUALIFICATION [5]

    I.   INTRODUCTION [5]

    II.  JUDICIAL CONDUCT [6]
        A. THE RESPONSIBILITIES OF A MILITARY JUDGE [6]
        B. PRODUCTION OF WITNESSES [8]
        C. STANDARDS OF CONDUCT -- IN GENERAL [9]
        D. IMPARTIALITY [11]
        E. EX PARTE COMMUNICATIONS [14]
        F. DISQUALIFICATION UNDER THE UCMJ
           AND THE MANUAL FOR COURTS-MARTIAL [16]
        G. PROCEDURE [18]

    III. BACKGROUND [21]
        A. THE RECORD OF TRIAL [21]
        B. POST-TRIAL PROCESSING [82]
        C. ADDITIONAL EVIDENCE CONCERNING THE CONFRONTATIONS
           DISCLOSED DURING APPELLATE REVIEW [86]
        D. DESCRIPTIONS OF THE CONFRONTATIONS
           OUTSIDE THE RECORD OF TRIAL [87]
        E. DESCRIPTION OF AN EX PARTE COMMUNICATION
          BETWEEN THE MILITARY JUDGE AND TRIAL COUNSEL [100]
        F. THE MILITARY JUDGE'S DECISION
           TO LIMIT DISCLOSURE AT TRIAL [102]

    IV.  DISCUSSION [105]
        A. WAIVER UNDER RCM 902(e) [106]
        B. APPEARANCE OF BIAS UNDER RCM 902(a) [110]
        C. REMEDY [118]


PART B. LEGAL SUFFICIENCY OF THE EVIDENCE,
        INSTRUCTIONS, AND EXPERT TESTIMONY [121]

    I.   LEGAL SUFFICIENCY OF THE EVIDENCE SUPPORTING THE CHARGE
        OF FORCIBLE SODOMY (ADDITIONAL CHARGE I) [121]
        A. BACKGROUND [121]
        B. DISCUSSION [122]

      II.  FINDINGS INSTRUCTIONS [123]
           A. BACKGROUND [123]
           B. DISCUSSION [125]

      III. ADMISSION OF EXPERT WITNESS TESTIMONY [127]
           A. BACKGROUND [127]
           B. DISCUSSION [130]


PART C. CONCLUSION [132]

## PROCEDURAL HISTORY

The present case produced lengthy and complex proceedings not only at trial, but also during post-trial consideration by the convening authority and the Court of Criminal Appeals. Charges against appellant were referred to a general court-martial on April 14, 1996, and the court-martial held its first session on May 7, 1996.  The court-martial, which was composed of officer and enlisted members, convicted appellant, contrary to his pleas, of forcible sodomy of a child under the age of 16, indecent assault, and indecent acts, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively.  On August 22, 1996, the court-martial sentenced appellant to a bad-conduct discharge, confinement for three years, forfeiture of $300 pay per month for 36 months, and reduction to the lowest enlisted grade.  Following various post-trial submissions, the case was transferred to a different convening authority, who approved these results on July 21, 1997.  The litigation at the Court of Criminal Appeals was

marked by numerous requests for extensions by both parties.  On April 17, 2000, the Court of Criminal Appeals affirmed in a published opinion. 52 MJ 839 (2000).

Upon appellant's petition, we granted review of the following issues:

> I. WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF APPELLANT WHEN HE ABANDONED HIS IMPARTIAL JUDICIAL ROLE AND THEREAFTER FAILED TO DISQUALIFY HIMSELF SUA SPONTE, PURSUANT TO RULE FOR COURTS-MARTIAL 902, SUBSECTIONS (a) AND (b).
>
> II. WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FINDING WAIVER AND NO PREJUDICE WHEN THE "INTEMPERATE" MILITARY JUDGE ABANDONED HIS IMPARTIAL JUDICIAL ROLE AND THEREAFTER FAILED TO DISQUALIFY HIMSELF SUA SPONTE, PURSUANT TO RULE FOR COURTS-MARTIAL 902, SUBSECTIONS (a) AND (b).
>
> III. WHETHER THE EVIDENCE OF RECORD WAS LEGALLY INSUFFICIENT TO SUPPORT A FINDING OF GUILTY AS TO THE CHARGE OF FORCIBLE SODOMY (ADDITIONAL CHARGE I AND ITS SPECIFICATION).
>
> IV. WHETHER THE MILITARY JUDGE'S ERRORS IN THE FINDINGS INSTRUCTIONS CAUSED PREJUDICIAL ERROR IN APPELLANT'S CASE.
>
> V. WHETHER THE GOVERNMENT FAILED TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE TO THE DEFENSE DURING APPELLANT'S COURT-MARTIAL, IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION.
>
> VI. WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE GOVERNMENT'S EXPERT WITNESS'S TESTIMONY OVER THE DEFENSE COUNSEL'S DAUBERT OBJECTION.

4

For the reasons set forth below, we affirm the findings in part and remand the balance of the case for further proceedings. Part A of this opinion concerns the issue of judicial disqualification. Part B concerns issues of legal sufficiency of the evidence, instructions, and expert testimony.

PART A. JUDICIAL DISQUALIFICATION

I. INTRODUCTION

The first two granted issues pertain to a series of out-of-court confrontations between the military judge and a civilian witness, Mr. Bernstein, in which the military judge initiated physical contact and used profanity. Although some information about the confrontations was placed in the record through a series of partial revelations, the military judge did not ensure that a complete disclosure of the facts was set forth in the record of trial. Moreover, the record does not reflect evidence of a critical, ex parte discussion in the midst of the proceedings between the military judge and trial counsel, described in a post-trial memorandum prepared by the trial counsel. Many of the details concerning the confrontations were not revealed at trial, but were set forth in separate investigative records compiled during the trial and immediately thereafter, which were not made available to the defense until several years after the trial.

## II. JUDCIAL CONDUCT

### A. THE RESPONSIBILITIES OF A MILITARY JUDGE

The position of military judge was established through amendments to the Uniform Code of Military Justice made by the Military Justice Act of 1968. The 1968 amendments represented an effort to "streamline court-martial procedures in line with procedures in U.S. district courts . . . and give [military judges] functions and powers more closely allied to those of Federal district judges." S. Rep. No. 90-1601, at 3 (1968). As a result of that legislation, the military judge has "judicial stature and authority in the courtroom" that "closely approximate[s] that of a civilian trial judge." 114 Cong. Rec. 30564 (1968) (remarks of Rep. Philbin).

The military judge is the presiding authority in a court-martial and is responsible for ensuring that a fair trial is conducted. Art. 26, UCMJ, 10 USC § 826; RCM 801(a) and Discussion, Manual for Courts-Martial, United States (2000 ed.). The judge has broad discretion in carrying out this responsibility, including the authority to call and question witnesses, hold sessions outside the presence of members, govern the order and manner of testimony and argument, control voir dire, rule on the admissibility of evidence and interlocutory questions, exercise contempt power to control the proceedings,

and, in a bench trial, adjudge findings and sentence. See, e.g., Arts. 39(a), 46, 48, and 51, UCMJ, 10 USC §§ 839(a), 846, 848, and 851; Mil.R.Evid. 104(a), 611(a), and 614, Manual, supra; RCM 801(a)(3) (Discussion), 802, 803, 809, 912, 922(c), and 1007(a); see also Weiss v. United States, 510 U.S. 163, 167-68 (1994). "In short, a military judge does the type of things that civilian judges do." United States v. Graf, 35 MJ 450, 457 (CMA 1992), cert. denied, 510 U.S. 1085 (1994).

There are important distinctions, however, between a military judge and a federal civilian judge, aside from the absence of tenure discussed in Weiss, supra. A federal civilian judge typically has jurisdiction over all cases arising under applicable federal law, but a military judge does not exercise general jurisdiction over cases arising under the UCMJ. A military judge may exercise authority only over the specific case to which he or she has been detailed. Art. 26; Weiss, supra at 172. In contrast with the civilian judiciary, a military judge has no courtroom, clerk of court, or marshals. Instead, the military judge is almost entirely dependent upon the facilities and personnel made available by the convening authority for the conduct of the trial. Many of the administrative functions performed by clerks of court or U.S. Marshals in civilian life are assigned in the military justice system to the trial counsel, who also acts as the prosecutor.

See RCM 502(d)(5)(Discussion); compare Fed. R. Crim. P. 17(a) and (d).


## B. PRODUCTION OF WITNESSES

The trial counsel's responsibilities include the duty to obtain the presence of witnesses for both the prosecution and the defense, including the issuance of military orders for active duty witnesses and subpoenas for civilians. See RCM 703(e). Absent a subpoena, a civilian cannot be compelled to testify at a court-martial.

A military judge may issue a warrant of attachment to compel the presence of a civilian witness, but "only upon probable cause to believe that the witness was duly served with a subpoena, that the subpoena was issued in accordance with . . . [applicable] rules, that appropriate fees and mileage were tendered to the witness, that the witness is material, that the witness refused or willfully neglected to appear at the time and place specified on the subpoena, and that no valid excuse reasonably appears for the witness' failure to appear." RCM 703(e)(2)(G)(ii).

In contrast to federal civilian judges, military judges do not have the power to treat non-compliance with a subpoena as a contempt of court. Compare Fed. R. Crim. P. 17(g) with Art. 47, UCMJ, 10 USC § 847. In a court-martial, if a civilian not

subject to the UCMJ refuses to appear or testify after receiving a subpoena, the matter is referred to the appropriate U.S. Attorney for prosecution in the federal civilian courts. See Art. 47; RCM 809 (Discussion).

## C. STANDARDS OF CONDUCT -- IN GENERAL

This Court and the military departments have looked to the 1972 American Bar Association Code of Judicial Conduct (now the ABA Model Code of Judicial Conduct) and the ABA Standards for Criminal Justice (ABA Standards) for guidance on proper conduct in criminal trials. See, e.g., United States v. Wright, 52 MJ 136, 141 (1999); United States v. Hamilton, 41 MJ 32, 39 (CMA 1994); United States v. Loving, 41 MJ 213, 327 (1994), aff'd, 517 U.S. 748 (1996). The Army has expressly adopted the ABA Code to the extent that it does not conflict with the UCMJ, Manual for Courts-Martial, or other rules governing courts-martial. Para. 5-8, AR 27-10, Military Justice (20 Aug 1999).[1]

Canon 3 of the ABA Model Code (2000 ed.) provides that "[a] judge shall perform the duties of judicial office impartially and diligently." Two sections of Canon 3 are of particular relevance to this case: (1) Section B(4) requires a judge to

---

[1] For a discussion of the adoption or modification of model codes and standards by the military departments, see Francis A. Delzompo, When the Military Judge Is No Longer Impartial: A Survey of the Law and Suggestions for Counsel, Army Lawyer at 3 (June 1995).

"be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, and others"; and (2) Section B(5) establishes that "[a] judge shall not . . . by words or conduct manifest bias or prejudice."  The commentary on the latter section elaborates, as follows:

> A judge must perform judicial duties impartially and fairly.  A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute.  Facial expression and body language, in addition to oral communication, can give to parties or lawyers in the proceeding, jurors, the media and others an appearance of judicial bias.  A judge must be alert to avoid behavior that may be perceived as prejudicial.

The ABA Standards, which have similar provisions,[2] require judges to exercise self-restraint:

> The trial judge should be the exemplar of dignity and impartiality.  The judge should exercise restraint over his or her conduct and utterances.  The judge should suppress personal predilections, and control his or her temper and emotions.  The judge should not permit any person in the courtroom to embroil him or her in conflict, and should otherwise avoid personal conduct which tends to demean the proceedings or to undermine judicial authority in the courtroom.  When it becomes necessary during the trial for the judge to comment upon the conduct of witnesses, spectators, counsel, or others, the judge should do so in a firm, dignified, and restrained manner, avoiding repartee,

---

[2] The Code of Conduct for United States Judges (1999), applicable to federal judges and specifically adopted by this Court, see id., Chapt. 1, Intro., contains similar provisions regarding the maintenance of impartiality, dignity, and decorum in proceedings.  See, e.g., Canon 2A and comment, and Canon 3A(2), (3), and comment.

10

> limiting comments and rulings to what is
> reasonably required for the orderly progress
> of the trial, and refraining from
> unnecessary disparagement of persons or
> issues.

Standard 6-3.4, Special Functions of the Trial Judge (2d ed. 1980).

Such standards generally are regarded as principles to which judges should aspire and are enforced primarily through disciplinary action and advisory opinions, rather than through disqualification in particular cases.  See Richard E. Flamm, Judicial Disqualification § 2.6.3 at 45 (1996).  In many jurisdictions, particularly in the federal courts, actions that violate codes of conduct do not necessarily provide a basis either for disqualification of a judge or reversal of a judgment unless otherwise required by applicable law. Id.

## D. IMPARTIALITY

"An accused has a constitutional right to an impartial judge." Wright, supra, 52 MJ at 140, citing  Ward v. Village of Monroeville, 409 U.S. 57 (1972); Tumey v. Ohio, 237 U.S. 510 (1927).  The impartiality of a presiding judge is crucial, for "'[t]he influence of the trial judge on the jury is necessarily and properly of great weight,' . . . and jurors are ever watchful of the words that fall from him.  Particularly in a criminal trial, the judge's last word is apt to be the decisive

11

word." United States v. Shackleford, 2 MJ 17, 19 (CMA 1976)

(quoting United States v. Clower, 23 USCMA 15, 18, 48 CMR 307,

310 (1974)(internal citations omitted)).

The Manual also emphasizes the importance of an impartial

judiciary, advising military judges that when carrying out their

duties in a court-martial, they "must avoid undue interference

with the parties' presentations or the appearance of

partiality." RCM 801(a)(3) (Discussion).[3] The military judge

must exert his authority with care, so as not to give even the

appearance of bias for or against either party. Id. The

military judge is also charged with ensuring that the "dignity

and decorum of the proceedings are maintained," as "[c]ourts-

martial should be conducted in an atmosphere which is conducive

to calm and detached deliberation and determination of

the issues presented." RCM 801(a)(2) and Discussion. The

Manual reflects Canon 3A(3) of the Code of Conduct for United

---

[3] Concern about impartiality and judicial temperament can be traced back to the 1951 Manual, which states:

> [The law officer] should bear in mind that his undue interference or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, may tend to prevent the proper presentation of the case, or hinder the ascertainment of truth.
> . . . In addressing counsel, the accused, witnesses, or the court, he should avoid a controversial manner or tone. He should avoid interruptions of counsel in their arguments except to clarify his mind as to their positions, and he should not be tempted to the unnecessary display of learning or a premature judgement.

Para.39b(2), Manual for Courts-Martial, United States, 1951.

States Judges (1999), which provides that "[a] judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity . . . ."

The paramount importance of impartiality does not mean that the military judge should act as "simply an umpire in a contest between the Government and accused."  United States v. Kimble, 23 USCMA 252, 254, 49 CMR 384, 386 (1974).  The judge's role is complex, for exercising evenhanded control of the proceedings without veering, or appearing to veer, too far to one side or the other has been characterized by this Court as walking a "tightrope."  Shackleford, 2 MJ at 19.

A number of cases have suggested that disqualification applies to actions that are extra-judicial, or personal, and not judicial in nature.  See Liteky v. United States, 510 U.S. 540, 549 (1994); In re Corrugated Container Antitrust Litigation, 614 F.2d 958, 964 (5th Cir. 1980); In re Boston's Children First, 244 F.3d 164, 168 (1st Cir. 2001).  This view is reflected in the Drafters' Analysis of RCM 902(b), Manual, supra at A21-50.  The case law, however, does not clearly distinguish between matters that are "extra-judicial" or "personal" and matters that are "judicial."  Actions taken in the course of a trial may warrant disqualification where "it can be shown that such bias was either directed against a party or its counsel, or in favor of

13

the adverse party or counsel, or that the challenged judge, in order to compensate for the appearance of such a bias, has bent over backwards to make it seem as though he has not acted as a result of such bias." Flamm, supra, § 4.3 at 113-14 (footnotes omitted).

There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings. See id., § 4.6.4 at 136-37 (suggesting that only extraordinary circumstances involving pervasive bias warrant disqualification when the alleged bias is based upon judicial actions). The Supreme Court, in a case involving the extra-judicial source doctrine and the appearance of bias, has noted that remarks, comments, or rulings of a judge do not constitute bias or partiality, "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555.

## E. EX PARTE COMMUNICATIONS

The Code of Conduct for United States Judges contains a number of rules to ensure that judges steer clear of circumstances that would demonstrate bias or the appearance of bias. One such rule is Canon 3A(4), which provides that "[a]

judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." The limitation generally applies to "oral discussions about a pending or impending proceeding between a judge and another [person] that not all of the attorneys of record in that proceeding are present to hear, or written communications about such a proceeding that less than all the attorneys of record have contemporaneously received copies of." Flamm, supra, § 14.1 at 406 (footnotes omitted).

Under circumstances not pertinent to the present appeal, certain ex parte communications are permissible. Id., § 14.3.1 at 410. Moreover, in light of the potential for incidental communications that involve non-controversial matters such as routine scheduling discussions, the fact of an ex parte communication does not mandate disqualification. Id.; see also United States v. Alis, 47 MJ 817, 824 (A.F.Ct.Crim.App. 1998) (citing United States v. Chavira, 25 MJ 705 (ACMR 1987)("When circumstances require, ex parte communications for scheduling or administrative purposes that do not deal with substantive issues are authorized provided no party gains a tactical advantage as a result . . . and the judge makes provision promptly to notify

15

all other parties of the substance of the communication.")). A decision on disqualification will "depend on the nature of the communication; the circumstances under which it was made; what the judge did as a result of the ex parte communication; whether it adversely affected a party who has standing to complain; whether the complaining party may have consented to the communication being made ex parte, and, if so, whether the judge solicited such consent; whether the party who claims to have been adversely affected by the ex parte communication objected in a timely manner; and whether the party seeking disqualification properly preserved its objection." Flamm, supra, § 14.3.1 at 411-12 (footnotes omitted).

### F. DISQUALIFICATION UNDER THE UCMJ AND THE MANUAL FOR COURTS-MARTIAL

The Uniform Code of Military Justice provides that "[n]o person is eligible to act as military judge in a case if he is the accuser or a witness for the prosecution or has acted as investigating officer or a counsel in the same case." Art. 26(d). The President has promulgated additional disqualification standards in RCM 902, which parallel the statute governing disqualification of federal civilian judges, 28 USC § 455. See Art. 36(a), UCMJ, 10 USC § 836(a) (presidential rulemaking authority); Drafters' Analysis of RCM

902, Manual, supra at A21-50.  Our Court considers the standards developed in the federal civilian courts, as well as our own case law, when addressing disqualification issues arising under RCM 902. See, e.g., Wright, 52 MJ at 140-41.

RCM 902 divides the grounds for disqualification into two categories – specific circumstances connoting actual bias and the appearance of bias.  RCM 902(b) lists five specific circumstances requiring disqualification, including two that are pertinent to the present appeal.

RCM 902(b)(1), which provides for disqualification "[w]here the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts," applies the same substantive standard as its civilian counterpart, 28 USC § 455(b)(1).  RCM 902(b)(3) provides for disqualification "[w]here the military judge has been or will be a witness in the same case."  See Art. 26(d).  The Drafters' Analysis notes that "[t]he purpose of this section is analogous to that of 28 USC § 455(b)(3)."  Manual, supra at A21-51.

RCM 902(a), which addresses the appearance of bias, requires disqualification of a judge when "that military judge's impartiality might reasonably be questioned."  This is the same standard as applied under the federal civilian statute, 28 USC § 455(a).

Under subsection (a), disqualification is required "in any proceeding in which [the] military judge's impartiality might reasonably be questioned," even though the evidence does not establish actual bias. The appearance standard is designed to enhance public confidence in the integrity of the judicial system. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988). The rule also serves to reassure the parties as to the fairness of the proceedings, because the line between bias in appearance and in reality may be so thin as to be indiscernible. Flamm, supra, § 5.4.2 at 151; see also Liteky, 510 U.S. at 565 (Kennedy, J., concurring in the judgment)("In matters of ethics, appearance and reality often converge as one.").

In short, RCM 902, like 28 USC § 455, requires consideration of disqualification under a two-step analysis. The first step asks whether disqualification is required under the specific circumstances listed in RCM 902(b). If the answer to that question is no, the second step asks whether the circumstances nonetheless warrant disqualification based upon a reasonable appearance of bias.

### G. PROCEDURE

As a matter of procedure, counsel may move for the disqualification of a military judge, but military judges also

have a continuing duty to recuse themselves if any of the bases of disqualification under RCM 902 develop. RCM 902(d)(1). Both parties are permitted to question the military judge and to present evidence concerning the possible ground for disqualification prior to the judge's decision. RCM 902(d)(2). Of all the grounds for disqualification in RCM 902, only the appearance of bias may be waived, RCM 902(a), after full disclosure of the basis on the record. RCM 902(e).

In federal civilian courts, parties may raise the recusal issue by motion, but the judge also has a sua sponte duty to determine whether he or she should continue to preside over a proceeding. Davis v. Board of School Commissioners of Mobile County, 517 F.2d 1044, 1051 (5th Cir. 1975)(28 USC § 455 is self-enforcing on the part of the judge; it may be asserted by party by motion in trial court, through assignment of error on appeal, by interlocutory appeal, or by mandamus). Some circuits have expressed the opinion that, after disclosing information that might form a basis for disqualification under § 455(a), the judge should make his own determination on the issue without asking counsel to express their views on the judge's ability to sit. See United States v. Kelly, 888 F.2d 732, 746-47 (11th Cir. 1989)(holding, in accord with other circuits, that a federal judge should make his own decision on disqualification because "[t]he too frequent practice of advising counsel of a possible

conflict, and asking counsel to indicate their approval of a judge's remaining in a particular case is fraught with potential coercive elements which make this practice undesirable.").

Although the federal statute does not detail the procedure for obtaining a waiver of disqualification from the parties, early and full disclosure by the judge in circumstances free from any subtle coercion generally is considered to be an essential predicate to acceptance of waiver. See United States v. Nobel, 696 F.2d 231, 236-37 (3rd Cir. 1982). A procedure for obtaining waiver is set forth in Canon 3D of the Code of Conduct for United States Judges, which provides:

> A judge disqualified by the terms of Canon
> 3C(1), except in the circumstances
> specifically set out in subsections (a)
> through (e), may, instead of withdrawing
> from the proceeding, disclose on the record
> the basis of his disqualification. If the
> parties and their lawyers after such
> disclosure and an opportunity to confer
> outside of the presence of the judge, all
> agree in writing or on the record that the
> judge should not be disqualified, and the
> judge is then willing to participate, the
> judge may participate in the proceeding.
> The agreement shall be incorporated in the
> record of the proceeding.

The Compendium of Selected Opinions to the Code of Conduct for United States Judges provides a further gloss on obtaining waiver of disqualification for an appearance of impropriety:

> The decision as to whether there is or is
> not a reasonable appearance of impropriety
> is a decision to be made by the judge;

20

> counsel or parties should not be consulted
> on that issue.  If the judge determines that
> there is a reasonable appearance of
> impropriety, the judge must either recuse,
> or invoke the Canon 3D procedure in full.

§ 3.8-2[1](c).  Although the procedure in Canon 3D is not required under 28 USC § 455(e), courts have cited the Canon with approval. See Noble, supra.


## III. BACKGROUND

This section provides a detailed account of the events at the time of trial and during appellate review to reflect the evolution of the disqualification issue in this case.  Because the military judge did not make a comprehensive disclosure of the pertinent events, the following not only sets forth information from the record of trial, but also the differing recollections of the participants as contained in material developed after the trial.


### A. THE RECORD OF TRIAL

### 1. THE CHARGED OFFENSES

#### a. Charges of Sexual Impropriety With Three Civilian Teenagers

Appellant was charged with offenses arising from sexual contact with five individuals: two military members and three civilian teenagers.  The charges involving the civilian teenagers provide the context for the unusual events that

transpired during the lengthy trial, post-trial, and appellate proceedings in this case.

Appellant was divorced and lived off-post with his teenage son. During the two-year period covering the charged offenses, several other soldiers and civilians lived in the house at various times, including JB, a 19-year-old high school student. Subsequently, JB moved out of appellant's home and lived with his employer, Mr. Bernstein, who owned a chain of pizza parlors. JB informed Mr. Bernstein that appellant had forcibly performed oral sodomy on him while the two were sitting in appellant's parked car.

Mr. Bernstein also employed CS, who was a friend of JB. During an employment interview, CS told Mr. Bernstein that appellant had indecently assaulted him after getting him drunk. When Mr. Bernstein subsequently learned that RW, JB's 15-year-old half-brother, had spent time with appellant, he became suspicious that appellant might have molested RW as well. Mr. Bernstein informed RW's father, Master Sergeant (MSG) W, who questioned his son. RW told MSG W that appellant had sexually molested him at appellant's house. Mr. Bernstein did not speak directly to RW about these allegations. The allegations regarding all three civilian teenagers were brought to the attention of military authorities by Mr. Bernstein.

b. The Charges Involving Military Personnel

The remaining charges involved sexual contact with two members of the armed forces at various times during 1993 through 1995. Private (PVT) B, a new member of appellant's battalion, arrived when most of the unit was deployed. At appellant's suggestion, PVT B joined appellant off-post for a game of pool, and then went to appellant's house. PVT B accepted appellant's invitation to spend the night at appellant's house. PVT B testified that shortly after retiring for the evening, appellant touched PVT B's genitals. PVT B then departed and obtained a ride back to Fort Hood, where he reported the incident to the staff duty noncommissioned officer (NCO).

The other offenses involved CJ, who was on active duty at the time of the incidents but had left military service at the time of trial. CJ's testimony covered two separate incidents of sexual contact, one in the barracks and one at a party in appellant's home. CJ testified that he consumed a large quantity of beer, fell asleep on the bedroom floor, and woke up to find appellant touching his genital area.

Neither of the victims had any contact with Mr. Bernstein prior to trial. Appellant was convicted of the charge involving PVT B. He was also convicted of one of the specifications involving CJ and acquitted of the other.

## 2. OVERVIEW

At trial, the defense strategy focused primarily on Mr. Bernstein's role, suggesting that the reports of abuse were not credible and that he had manipulated the teenagers into making false charges.  The trial was marked by conflicts between Mr. Bernstein and the military judge, including two out-of-court confrontations.  The out-of-court confrontations between the military judge and Mr. Bernstein not only affected procedural aspects of the trial, but also became the focus of evidence introduced for consideration by the members during trial on the merits.

## 3.  PROCEEDINGS PRIOR TO THE CONFRONTATIONS

Appellant was arraigned on May 7, 1996, and pretrial motions and related proceedings were considered on August 10 and 19.  A variety of circumstances delayed commencement of trial on the merits, including a lengthy, defense-requested continuance to accommodate the schedules of both civilian and military defense counsel.

After additional pretrial matters were considered on the morning of August 20, trial on the merits began with opening statements.  During the opening statements, the prosecution summarized expected testimony on each charge and indicated that expert testimony would be offered to explain delayed reporting

in terms of the reluctance of young victims to report sexual abuse.  The defense counsel's opening statement focused on potential inconsistencies in the anticipated testimony of prosecution witnesses, implying that at least some of the witnesses were manipulated by Mr. Bernstein, who was described by defense counsel as "the key to the whole thing."

After the opening statements and prior to commencement of the prosecution's case on the merits, the military judge conducted a routine session under Article 39(a), UCMJ, 10 USC § 839(a), regarding expert witnesses.  During the course of that discussion, he expressed concern that trial counsel had not given the bailiff a list of prosecution witnesses showing the order in which they would appear.  He admonished the trial counsel to have his witnesses organized so that the court-martial would "not have to wait 10 minutes between witnesses."

When the court reconvened early in the afternoon on August 20, the prosecution called its first witness -- CS -- one of the civilians named as a victim in the charges.  Defense counsel immediately requested a brief delay for purposes of interviewing the witness.  After determining that the defense previously had the opportunity to interview the witness at the pretrial investigation under Article 32, UCMJ, 10 USC § 832, the military judge expressed concern about further delay, noting that "witnesses in cases like this do tend to be a little reluctant,

a little frail; and we had them waiting all morning." Defense counsel withdrew his request for a delay, and the prosecution began its examination of CS.

CS testified that appellant encountered him at school and offered him a ride home. He added that instead of going to CS's home, they went to appellant's house, where appellant served him beer, showed pornographic movies, and initiated sexual activity without CS's consent. CS further testified that he did not tell his parents or friends about this because he was embarrassed.

He stated that he eventually told his employer, Mr. Bernstein, what had transpired after learning that JB, a fellow employee, "had been attacked" by appellant. In his cross-examination, defense counsel explored inconsistencies between the testimony presented in court and at the Article 32 hearing, and focused on Mr. Bernstein's role in bringing the allegations to the attention of CS's father and the prosecution.

4. THE DELAY IN BRINGING JB TO THE WITNESS STAND

After CS completed his testimony, the prosecution called its second witness, JB -- another of the teenage civilians named in the charges as a victim. The record of trial contains a cryptic description about what then transpired.

Initially, the record indicates some difficulty with respect to the witness:

TC:   We call J* B*.

[*Specialist Bennett, legal specialist, withdrew from the courtroom, and reentered shortly thereafter and conferred with the trial counsel.*][4]

MJ:   Tell Mr. B* to come in; tell him I said so.

[*Specialist Cooks, legal specialist, withdrew from the courtroom.  Captain Henry, seated in the spectator section withdrew from the courtroom.*][5]   [*Time lapse.*]

MJ:   Okay.  I've got a premonition.  Gentlemen, please go into the deliberation room.  We'll be getting to you shortly.

TC:   Sir--sir, if I may.  If we get him, I'd like to hear him testify.

MJ:   I understand that.  Would you go get him please?

TC:   Yes, sir.

MJ:   Thank you.

[*Captain Schwind[6] withdrew from the courtroom.*]

[*Time lapse.*]

The military judge called a brief recess at 2:28 p.m.  Four minutes later, he convened an Article 39(a) session and indicated that the difficulty in obtaining JB's appearance was related to Mr. Bernstein.

MJ:   This Article 39(a) session is called to order.  All are present as before.  The members are absent.  Captain Schwind is absent.

---

[4] The bracketed material in italics is from the record of trial.

[5] CPT Henry, a spectator in the courtroom, was the Chief of Military Justice of the 1st Cavalry Division.

[6] The Trial Counsel (TC).

Mr. Bernstein, who I have met, is highly upset. He believes he was treated in an improper way. I could not have a conversation with Mr. Bernstein because I had this premonition that I would revisit everything I was about to say. I invited Mr. Bernstein in. I believe I called for the MP's to come here, is that correct?

CPT Henry: *[From spectator section.]* Yes, sir. They're on their way.

MJ: Very well. Okay.

Now, I want you Captain Christensen,[7] to kick out-- Captain Schwind, sit down with Mr. Bernstein, tell him we're going to have a trial; tell him if he leaves that I may dismiss the charges and all this work is for naught.

*[Captain Schwind reentered the courtroom.]*

MJ: Was Mr. Bernstein going to come in?

TC: Sir, he's attempting to call Colonel Naccarato.[8]

MJ: Everybody stay here.

*[Stepped down from the judge's bench.]*

Cooks, you're my witness. Put your ears on.

*[The military judge and Specialist Cooks withdrew from the courtroom.]*

Following this announcement, a second brief recess began at 2:33 p.m. Four minutes later, the Article 39(a) session was reconvened, and the military judge vaguely referred to the difficulties encountered in procuring JB's appearance:

---

[7] The Assistant Trial Counsel (ATC).

[8] The Staff Judge Advocate of III Corps, the headquarters above the 1st Cavalry Division in the chain of command.

*[The military judge and Specialist Cooks reentered the courtroom.]*

MJ:  Come on in, Mr.--what's his name?

TC:  [JB]

MJ:  [JB]  . . ., come on in and have a seat.

*[The witness entered the courtroom and took the witness stand.]*

MJ:  Let the record reflect that I went out with--are we on the record?  Article 39(a) called to order.  All are present as before.  The members are absent.  Mr. [JB] is on the witness stand.

Specialist Cooks--
*[Assistant trial counsel stood.]*

Talk to me.

ATC:  I just wanted to let you know, sir, Captain Schwind is present now.

MJ:  Okay.  Well, we can't have everything.  Okay. Specialist Cooks and I went out to talk to Mr. Bernstein. Mr. Bernstein is apparently a good friend of . . . . [JB]. He is very protective of . . . [JB].

* * *

. . . . Mr. Bernstein is eager to avoid problems.  He believes that--and what sent him off, so the record is straight:  Apparently, he believes that a captain, who he believes his first word begins with an "F" and ends with a "G" had spoken inappropriately to him--and I think he's referring to you, Captain Brown[9]--and Mr. Bernstein is all upset.

DC:  What?

CDC:  Sir, for the record, he's talking--he was in here, sir.

---

[9] Detailed Defense Counsel (DC).

29

> CPT Henry: *[From the spectator section.]* He's talking about me, sir.
>
> MJ: Oh, he's talking about Captain Henry?
>
> CPT Henry: Yes, sir.
>
> MJ: Oh, great. I'm sorry. I thought it was the other F-captain. In any event, Mr. Bernstein is all upset. And what I did was: I went and I reminded Mr. Bernstein that we weren't calling him as a witness at this point; we were calling . . . [JB]; and that, we were going to have a trial. And that, all I wanted . . . [JB] to do was come in and testify, and testify truthfully, and give . . . [JB] an opportunity to put this incident behind him in one way or another this week. And that, if people all wanted to go home there were no subpoenas, but that would just cause the government to issue subpoenas next week, and this trial would continue in a few more weeks.
> . . . [JB], my recollection is you decided that you wanted to come in and put this behind you today and not worry about it later. Is that right?
>
> [JB]: Yes--yes, sir.
>
> MJ: Okay. And with that, are there any questions?
>
> TC: No, sir.
>
> CDC: No, sir.
>
> MJ: Specialist Cooks, did I leave anything important out?
>
> SPC COOKS: *[From spectator section.]* No, sir.
>
> MJ: All right. Anything else?
>
> TC: No, sir.

Contrary to the impression that this account provided a complete description of events, this portion of the record omitted significant details as to what transpired outside the courtroom. See, e.g., Sections III.A.8., III.A.20., and III.D., infra.

### 5. JB'S TESTIMONY ON THE MERITS

After trial resumed, JB testified that he had rented a room in appellant's house, that appellant had initiated non-consensual sexual contact with him, that he had been too embarrassed to tell his parents or friends, that he subsequently moved into the house of his employer, Mr. Bernstein, and that he eventually told Mr. Bernstein what had transpired with appellant.  On cross-examination, the defense employed an approach similar to that used with CS, emphasizing contradictions between his trial testimony and his previous statements and highlighting the role of Mr. Bernstein in bringing his allegations to the attention of the Army.

### 6. THE RECESS PRIOR TO MR. BERNSTEIN'S TESTIMONY

Following JB's testimony, an Article 39(a) session was convened at 4:09 p.m. to consider an evidentiary matter.  Two minutes later, the military judge abruptly announced, "We're in recess."  The recess lasted for 39 minutes.

The record at that point does not reflect two important developments.  First, the military judge learned that Mr. Bernstein had made a complaint about him, and the complaint had come to the attention of the judge's superior within the judiciary.  Aspects of this development eventually would be placed on the record.  See Section III.A.11., infra.  Second,

the military judge and the trial counsel had an ex parte

conversation in which the trial counsel convinced the military

judge to delay placing information on the record concerning the

out-of-court confrontations between the military judge and Mr.

Bernstein.  The fact of the conversation was never on the record

and was not revealed to defense counsel until long after trial,

when the case was under appellate review.  See Section III.E.,

infra.

### 7. MR. BERNSTEIN'S TESTIMONY ON THE MERITS

Mr. Bernstein, who was called to the stand at 4:50 p.m.,

testified about the nature of his personal and employment

relationship with the civilian victims, as well his role in

bringing the allegations against appellant to the attention of

military and civilian law enforcement authorities.

### 8. MR. BERNSTEIN'S ARTICLE 39(A) TESTIMONY CONCERNING THE CONFRONTATIONS WITH THE MILITARY JUDGE

When Mr. Bernstein concluded his testimony on the merits,

he remained on the stand while the military judge called an

Article 39(a) session to discuss his out-of-court confrontations

with Mr. Bernstein.  The military judge elected not to provide a

narrative of what he knew, see Section III.F., infra, but chose

instead to explore the matter through an examination of Mr.

Bernstein:

MJ:  ... Mr. Bernstein, I received a call from my superior that you called him or someone else, and told my office--or told him that I assaulted you by pushing you--

WIT:  Yes, sir.

MJ:  And referred to you as a "m*****f*****."

WIT:  Yes, sir.

MJ:  Okay.  Would you please tell the parties here, in case they have questions of me or you concerning that.

WIT:  Your Honor did take me and *[demonstrated]* went like that to me, and used vulgarity, "What the f*** do you want me to do?" and told me that if I did not go in the courtroom that he would go ahead and put me in lockup.  And I was not subpoenaed by this court at all.

The military judge then attempted to obtain Mr. Bernstein's

agreement with his own understanding of what had transpired:

MJ:  Okay.  Now, this began because you stopped--or were interfering with the government in calling [JB] to court, is that correct?

WIT:  [JB] was not subpoenaed to court, sir.

MJ:  Okay.  Not my question.  Did you interfere with the prosecutor's attempt to have [JB] brought into court--

WIT:  Negative.

MJ:  --to provide--

WIT:  No, sir.

MJ:  Please.  My question, so we're clear on the answer: Did you interfere with--when the prosecution went out to get [JB] did you attempt to intervene in any way?

WIT:  No, sir.

The military judge turned to the issue of whether he had

assaulted Mr. Bernstein:

MJ: Very well. When I patted you on the shoulder, did you consider that an assault? That is, an offensive--

WIT: Yes, sir.

MJ: You did?

WIT: Yes, sir.

MJ: As an offensive touching?

WIT: Yes, sir.

MJ: Okay. Was Specialist Cooks--where is he?

SPC Bennett: *[From spectator section.]* He's gone, sir.

MJ: Say again?

SPC Bennett: He had to go, sir. He had to go to class.

MJ: Tell Specialist Cooks he's a witness.
Specialist Cooks, the 24-year-old, heavy set, African American gentleman, was present, was he not?

WIT: Yes, sir.

MJ: Very well.

Following that colloquy, the military judge discussed his use of profanity:

MJ: . . . Okay. Now, I did use profanity. I admit that.

WIT: Yes, sir.

MJ: And--

WIT: In front of--in front of a 20-year-old child.

MJ: A--yeah, the 20-year-old child who is the part owner of the corporation?

WIT: Yes, sir.

MJ: Okay. Now, at the time that I used profanity, you were in the process of telling me that you were--or you had or were getting General Schwartz[10] on the phone, is that correct?

WIT: Yes, sir.

MJ: And I told you that I didn't care--I think my words were "give a f*** what General--"

WIT: You didn't give a f***.

MJ: About General Schwartz, right?

WIT: Yes, sir.

MJ: And I told you that because--I said that I was a judge and it was my job not to care what commanders think.

WIT: Yes, sir.

MJ: So, was it more than that?

WIT: You did threaten me, yes, sir.

MJ: Okay. Well, we'll get to that. And at that point you looked at [JB]; you said, "I like this man," referring to me, "because he uses that F-word."

WIT: Yes, sir.

MJ: So, you told [JB], that 20-year-old child, that you liked me because I, like you, use the F-word?

WIT: I use "f***" a lot, yes, sir.

MJ: Okay. Good.

WIT: But not in the--but not in the word [sic] that you used it in.

---

[10] Commander of III Corps, the next step in the chain of command above Major General LaPorte, who had convened the court-martial as commander of the 1st Cavalry Division. Both organizations were headquartered at Fort Hood, Texas.

Subsequently, the military judge and Mr. Bernstein discussed the military judge's threat to hold Mr. Bernstein in contempt of court:

MJ:  And the threat was that you advised me that you were not in court and you were not a soldier, is that correct?

WIT:  Yes, sir.  And I also did--and I also did, to add this, I also did advise you that I was not under any subpoena whatsoever; that I could leave at anytime.

MJ:  Correct.  And I informed you that if you interfered with the court that you needed--

WIT:  That you would hold me in contempt of court.

MJ:  Correct.  And that was the threat?

WIT:  Yes, sir.  I was not--I was not inside your chambers, sir.

MJ:  Okay.  But the--

WIT:  Okay--

MJ:  But the threat was if you interfered with the proceedings, which included getting, . . . what's-his-face . . . into the courtroom--

WIT:  [JB], sir.

MJ:  [JB].  That I would hold you in court--in contempt, is that correct?

WIT:  Yes, sir.

After the military judge completed his discussion with Mr. Bernstein, he asked whether the parties had any questions.  At that point, a spectator, Mr. Hewitt, interrupted to note that he was Mr. Bernstein's attorney.  The military judge called a recess so that Mr. Hewitt could speak with Mr. Bernstein.

Following the recess, the military judge reconvened the Article 39(a) session, with Mr. Bernstein on the witness stand. The military judge began with an explanation for the manner in which he was proceeding:

> MJ:  Okay.  Let me--let me explain to you why I'm doing this.  I'm doing this because this is information which possibly might affect how the parties want to proceed in this trial, and what they want to do and how they want to do it.  That's why I'm doing this.  I don't care--I had my last promotion 3 years ago.  Okay.  When they don't want me on the bench anymore, I got a job, and I know when to retire.  I'm not doing this for Keith Hodges.  I'm doing this because I think justice requires it.

Trial counsel then questioned Mr. Bernstein, focusing on Bernstein's role on the day before trial and the morning of trial in terms of convincing a reluctant JB to testify.  Trial counsel did not ask questions concerning the circumstances surrounding the out-of-court confrontation between Mr. Bernstein and the military judge, except for the following brief exchange:

> TC:  Were you concerned about what might happen to him in this courtroom?
>
> WIT:  Yes, sir.
>
> TC:  You think that had something to do with what went on back there in my office and out there?
>
> WIT:  Yes, sir.

The defense counsel asked about the origins of the controversy between Mr. Bernstein and the military judge:

> CDC:  And because I wasn't actually a party to all of it, I guess my question is, what was the problem?  Was it that

37

you didn't want him to testify or was it that he didn't want to testify and that you convinced him or was it--

WIT:  Sir, he--he really was pretty frightened, sir, about testifying.  He did not want to be in the second line-up.  He wanted to be the third line-up, you know, to prepare himself, sir.  And may I add something to this?

CDC:  Yes.

WIT:  I think I just overreacted, and I don't think the Honor--the judge or me--I highly apologize to the judge, and highly apologize that--it was just out of basically frustration a little bit, Your Honor.

MJ:  Okay.

WIT:  And--

MJ:  I'm not looking for apologies.  I mean, I appreciate it and it's accepted; however, I'm looking for facts and not anybody to roll over on anything.

WIT:  Yes, sir.

CDC:  You mean you were threatening to leave the building?

WIT:  [JB] was.

CDC:  [JB] was?

WIT:  Yes, sir.

CDC:  And he was threatening to leave through you?

WIT:  [JB] did not want to actually be here today.  He did not want to face Quintanilla.  He did not want to look at Mr. Quintanilla.  And I told [JB] that this is something that is--it's his duty.

CDC:  Well, I was basically--and the reason I'm asking is the whole--the whole thing started, from my understanding is--is because you--you said, "We're out of here.  We're leaving."  And they said, "You can't go.  You gotta stay."  And you got upset about that.  Is that--is that somewhat accurate?

WIT:  I care about [JB] a lot, you know, and [JB] is a very personal person if you understand what I'm saying.  And he--he did not want to testify at this present time against William Quintanilla because he did not want to look at Mr. Quintanilla.

CDC:  And did he tell the government that he wanted to leave and did not want to testify--and the government being the trial counsel people--or did you tell them that?

WIT:  No, he told them that.

CDC:  Okay.  And--and I guess I'm confused about your--so, he's saying--did he say he was leaving or did you say you were leaving?

WIT:  I told him to go ahead and stay.  I--it was in--it's in his best interest to go ahead and get it over with.  Go ahead and face it and get it over with.

CDC:  And how did the controversy then all begin to where the judge actually had to leave the courtroom to get you? I mean--

WIT:  Over--it was honestly over just frustration.  It was just--I was just frustrated from being here for so long, and that was my--that was my mistake.

CDC:  So, your testimony is that you weren't going to leave the building, you were going to stay here?  You weren't telling anyone you were leaving?  You were going to stay here?

WIT:  Well, I was not under subpoena, you know, and I [sic] wondering when I was going to be called up, you know.  And I was going to leave the building and get something to eat.

CDC:  So, you just said, "I'm going to get something to eat and I'll be back"?

WIT:  Basically.  You know--

CDC:  And that's what started all of this?

WIT:  Yes, sir.  And it was--

MJ:  Next point, Craig.

39

WIT:  Say again, sir?

MJ:  Next point, Mr. Carlson.

CDC:  No further questions.

When the parties completed their questioning, the military

judge provided the following summary:

MJ:  For those who may possibly read this record later, let's back it up; and how at this point somebody may understand some of the unusual happenings on the record earlier.

After the testimony of [CS], the government called [JB]-- listen, government, because you got a role in this--called [JB].  I saw the bailiff come in, and heard her say, "He doesn't want to testify."  I mean, I saw that.  Heard it and saw it.  I sent a trial counsel out, and after waiting for that crab to return to the pot after several minutes, and he didn't come back.  And I remind the parties that this morning we had a long false start--it took us until 11:00.  And then the first thing that happened when [CS] got on the stand was there was a side-bar where the defense asked to interview [CS].  So, it was 1:00--12:30 when we were finally going to hear some evidence.  And now, I see, you know, people taking another unnecessary recess to find a witness.  I'm told that there is a problem with getting [JB] to come out.  Realizing that [JB] is apparently young, and the dynamics of this case, I went out in my uniform, not robe, to find out what happened.  At that time, I took a prosecutor--who was who?

TC:  Myself, sir.

MJ:  Schwind.  And I took Mr. Carlson.  When I got there, quite frankly, Mr. Bernstein was hanging off the rafters.  Okay.  And he calmed down.  He was very upset about some captain who had mistreated him.  I assumed it was Captain Brown, but later turned out it was Captain Henry, had said something or done something--it was a fair assumption, Captain Brown--had said something or done something that Mr. Bernstein was riled up.  It was my goal at that point to move the trial along.  I told Mr. Bernstein, "Don't worry about the captain."  I turned to [JB] and said,

40

"[JB], all this stuff about subpoenas and where you're going to be and not going to be, the point is we can finish this trial this week and this will be behind you or the government will have a delay, they'll issue subpoenas, and we'll be back in here next month. What do you want to do, [JB]?" JB said, "I want to testify." I said, "Good. Let's roll." Now, the part where you were present, is that accurate--

WIT: Yes, sir.

MJ: --what I just described?

WIT: Yes, sir.

MJ: All right. You got any spins or twists you want to put on it?

WIT: No animosity at all, sir.

MJ: Well, how about--

WIT: No.

MJ: Forget animosity--

WIT: No. No spins. Nothing, sir.

MJ: Okay. Came back in--came back in, put on the robe, sat down, and again prosecutors were leaving like rats on a sinking ship going in the area of the witness room. I didn't want anymore lawyers to leave the courtroom because I was having trouble keeping track of them. I was ready to put transponders on them. But thinking that I needed a witness would be a good idea, I took trusty Specialist Cooks with me into the room. At that point, he was on the telephone either calling Colonel Naccarato--later told General Schwartz. Mr. Bernstein and I had no problems understanding each other before. I informed Mr. Bernstein that I didn't work for General Schwartz; I didn't give a f*** what General Schwartz did or said, trying to emphasize that point. And judges don't like to have people think that commanders tell judges what to do. I'm not trying to flaunt it, it's just that I can't do my job if I work for commanders because they be [sic] the convening authority. Mr. Bernstein was still hanging off the rafters in my view.

I used my touchy-feely style, I tapped him--thumped him on the chest with an open hand, man--mano a mano,--

WIT:  Kind of like a father.

MJ:  --like I did to Captain Brown and said, "Calm down, let's get a hold of it.  We're going to trial.  Let's roll."  And the only thing that Mr. Bernstein said to me was, "Please don't let them beat up on [JB]."  And I told him that I was in charge of the proceedings and that I would allow the examination to go.  Now factually, is that accurate or inaccurate?

WIT:  Yes, sir.

MJ:  All right.  Any questions?  Captain Schwind, Captain Carlson--Mr. Carlson, all you others who were present in and out, would anybody like to add or detract from those facts?

CDC:  None from the defense.

TC:  No, Your Honor.

MJ:  Okay.  Mr. Bernstein, do you have anything to add?

WIT:  No, sir, I apologize.

MJ:  Okay.  It's not a problem.  It happens.  That's why trials are dynamic processes.  Let's take the remainder of the recess.  We're in recess.

Subsequent developments during and after trial would demonstrate both that Mr. Bernstein had not abandoned the belief that he had been assaulted and that there was more to the incident than had been placed on the record.  See Section III.D., infra.

## 9. CONTINUATION OF TRIAL ON THE MERITS
## DURING THE EVENING OF AUGUST 20

At first, the trial proceeded as if the confrontations between the military judge and Mr. Bernstein no longer were a matter of concern. The prosecution resumed its case on the merits with the testimony of the third alleged civilian victim, RW, who stated that he had been sexually molested by appellant, that he had not told anyone about it because he was embarrassed, and that he only disclosed it after being questioned by his father. Upon cross-examination by defense counsel, RW said even though he had not told anyone of the incident prior to being confronted by his father, it was his understanding that Mr. Bernstein had told his father that he had been molested. RW acknowledged that Mr. Bernstein was present at his house on the day his father confronted him about the molestation. Both parties asked numerous questions about when RW learned that Mr. Bernstein was the source of his father's information. RW's answers were inconclusive.

The prosecution continued its case with testimony from RW's father, who was also the stepfather of another civilian victim, JB. Much of the testimony focused on Mr. Bernstein's role in urging the father to determine whether RW had been molested, and his role in pursuing the investigation. Following his testimony, the court-martial recessed for the night at 8:10 p.m.

10. DEFENSE COUNSEL'S ALLEGATION OF JUDICIAL BIAS

On the following day, August 21, trial resumed with the prosecution presenting the testimony of Private First Class (PFC) B, the alleged victim in one of the indecent assault charges. PFC B testified that he had spent an evening at appellant's house, stayed overnight, and had been grabbed in the crotch by appellant in the middle of the night. The defense, in its cross-examination, attempted to raise doubts as to whether the circumstances demonstrated an indecent touching, and to also suggest the possibility of consent.

During the cross-examination, the military judge expressed concern about the pace of defense counsel's approach, which he perceived as redundant. When defense counsel began to explore the nature of PFC B's relationship with women, the trial counsel objected that the questions were not relevant. The military judge responded with a message to trial counsel:

> MJ:  If he wants to ask that line of
> questions, I'm going to go ahead and let
> him.  I think that--I think that--just let
> him go ahead.  Sit down, Captain Schwind.
> This is one of those objections you don't
> want to make.

In reaction to the military judge's comments, defense counsel immediately asked for an Article 39(a) session, at which he asserted that the military judge acted in a "partial" manner by telling the trial counsel, in front of the members, not to

44

pursue a particular line of objections.  The military judge

first responded that he had overruled trial counsel's objection,

and then set forth a lengthy critique of the defense theory with

respect to the cross-examination of PFC B.  When it became

apparent that defense counsel remained concerned, the military

judge offered a defense of his conduct of the trial, including a

reference to his encounter with Mr. Bernstein:

> MJ:  Mr. Carlson, I want you to think for
> just a moment about this entire trial.
>
> CDC:  Yes, sir.
>
> MJ:  What is the only time that I've gotten
> on the lawyers in this case?  Truly.  I
> mean, nitpicky stuff, but what's the only
> thing I've really gotten on the lawyers
> about?  Efficiency.
>
> CDC:  Yes, sir.
>
> MJ:  Okay.  I told you guys why you needed a
> reason at 9:00 when we put the members
> together.  I told you when a witness takes
> the stand and before the first question is
> asked people want another reason to talk for
> an hour.  The fact that I want to move this
> trial along got me the great pleasure of
> having Mr. Bernstein slander my reputation
> in the military.  I beat on Captain Schwind
> to pick up the pace and move on, and I've
> done that with you, but less frequently.
> Okay.
>
> CDC:  Yes, sir, and I will.

The military judge returned to defense counsel's concern about

his comments during trial, explaining that he had overruled

trial counsel's relevance objection, even though it might have

45

been sustained at the time, indicating that defense counsel subsequently could have established relevance.  The record reflects that before defense counsel could respond, trial counsel apparently felt obligated to interject a comment in support of the defense position:

> .... I can see part of Mr. Carlson's point, sir, is that your response to me seemed to express an opinion as to the worth or the nonworth of his objection--or my objection allowing him to testify.  I think that many have been presented.

The military judge apparently realized that an issue had been raised concerning an appearance of bias, and he engaged in a further colloquy with defense counsel:

> MJ:  Okay.  Is that your point?  Do you think that--do you think I'm sending pheromones?
>
> CDC:  Yes, sir.
>
> MJ:  I'll fix that.

Defense counsel noted that while the pace of his questioning may have amounted to "slow crawling," he was nearing the completion of his examination of PFC B.  The military judge, who viewed the defense concern as a recusal motion, announced that he would not recuse himself, but that he would instruct the members not to take any of his remarks about the pace of the proceedings as "an indication of the worth of anybody's case."

## 11.  THE MILITARY JUDGE SUGGESTS
## POST-TRIAL DISQUALIFICATION OF THE CONVENING AUTHORITY

At the conclusion of the Article 39(a) session, there was a 15-minute recess, which apparently included an out-of-court conference involving the military judge and counsel for the parties under RCM 802.  When the Article 39(a) session was reconvened, the military judge referred to the RCM 802 session but did not set forth a clear description of the out-of-court session on the record.  The record indicates that Mr. Bernstein's complaint to the commanding general continued to be a matter of concern, although the record does not clearly describe the nature of the complaint or how it came to the attention of the military judge.  The military judge, however, used the occasion to explain that he had decided not to recuse himself, and that he thought the convening authority should disqualify himself from post-trial action in the case:

> MJ:  I don't think this is on the record, let's do it quickly.  I was informed during 802 that we held in the courtroom that apparently--at what point in the proceedings did Mr. Bernstein talk to Colonel Lisowski[11] and/or the commanding general?
>
> TC:  I guess after he testified, sir.
>
> DC:  Yesterday evening, sir.

---

[11] The record does not identify "Colonel" Lisowski or his role at that point. The post-trial proceedings indicate Lieutenant Colonel Lisowski was the Staff Judge Advocate of the commander of the 1st Cavalary Division, the convening authority.

> MJ: The offer has been made to me for me to talk to Colonel Lisowski to know the nature of the conversations. While initially that appeared to be an attractive thing, I've decided that I don't want to hear about what Mr. Bernstein might have said because it might have involved me, and I don't want anybody to think that I care what the general says. And if I don't know what the general thinks, then I can't be influenced by what the general thinks. I've made my rulings. If I thought for a moment what Mr. Bernstein had done with regard to me affected my ability to try this case fairly, I would have recused myself. And I did not. However, I think it's a good point that the government should seriously consider in its post-trial actions if we get to a post-trial action, that a convening authority other that the current convening authority be used. And there's a law on that, and I'll leave it there.

The military judge did not explain why the circumstances would require disqualification of the convening authority but not the military judge.

The military judge then asked if there was "[a]ny other matter" the parties wanted to pursue on that subject. Defense counsel suggested that the military defense counsel might have some knowledge about the subject:

> CDC: Sir, we would--eventually we would like to put in on the record. I'm not sure if this is the point to put this on the record, but we do--Captain Brown does have knowledge of what happened, and I think it's important for it to be on the record at some point.

> MJ:  Is it important for it to be on the record for purposes of the merits or purposes of post-trial?
>
> CDC:  Post-trial, sir.  And I don't know--
>
> MJ:  Okay. . . .

The military judge, however, decided to not follow-up, so the issue was never explored on the record.

## 12. FURTHER TESTIMONY ABOUT MR. BERNSTEIN'S REACTION TO THE CONFRONTATION WITH THE MILITARY JUDGE

The military judge changed the subject, which led to consideration of whether Mr. Bernstein had attempted to influence the testimony of any of the witnesses in the waiting room:

> MJ: . . .Well, let's do it this way, is there anything that you are aware of right now that's been done in this case on the Bernstein situation that affects Sergeant Quintanilla's right or ability to get a fair trial?
>
> CDC:  Well, sir, actually there may be, and it's not something that we've just talked about, but it's come to my attention that in the last 5 minutes that he has talked to our witnesses yesterday while they were waiting for this trial.
>
> MJ:  Mr. Bernstein did?
>
> CDC:  Yes, sir.  Telling them that my client is guilty.  Now, I told Captain Brown before I wanted to make an issue of this that I was going to ask for time to go interview these people to find out what was said because I do not want to mislead the court or misstate something that was actually said.

At that point, PFC B was on the witness stand, and the military judge decided to question him about Bernstein's interaction with the other witnesses. PFC B described Bernstein as "annoying" and told the military judge that Bernstein "was mostly bitching about [demonstrated] you hit him on the chest." PFC B stated that Bernstein had not affected his testimony.

The military judge questioned PFC B further about the nature of Bernstein's remarks, and this led to further testimony about the confrontation between Bernstein and the military judge:

> MJ: Was Mr. Bernstein talking to you personally or was he carping out loud in a crowd in which you were present?
>
> WIT: He was just talking out loud, sir.
>
> MJ: Okay. So, was he talking to you or you were just in a group to whoever he was talking?
>
> WIT: He was basically talking out loud within a couple of people that were sitting in there, sir.
>
> MJ: Okay. And about when was this?
>
> WIT: It was right after you came out and spoke to him, sir, and the MP's showed up, sir.
>
> MJ: Okay. What did he say?
>
> WIT: Basically, he was [expletive] about it being [expletive] that he had to stay here, sir. That he's being held on Fort Hood as a captive.

MJ:  What else did he say?

WIT:  He was going to call up General Schwartz, sir, or whatever.

MJ:  What else did he say?

WIT:  Not really much else other than like you hit him on the shoulder, and you hit him.

MJ:  Yeah.  What else did he say?  We've already squared that away.  What else did he say?

WIT:  Captain Henry is an [expletive].

MJ:  You like saying that, didn't you, B*?  Okay.  What else did he say?

WIT:  Nothing other than that that I really paid attention to.  I was kind of laughing at him, sir.

MJ:  Why did you think he was annoying?

WIT:  Because he was bragging about he was a business owner in Killeen, and "I ran for city council," and blah, blah, blah.  Like I really give [an expletive], sir.

MJ:  Any questions of [PFC B]?

CDC:  No, sir.

TC:  No, sir.

The military judge ended the Article 39(a) session shortly thereafter.  When the members returned to the courtroom, the military judge endeavored to address the defense concern that his remarks had evidenced a bias against the defense by

51

instructing the members and by apologizing to counsel for the tenor of his remarks.

13. THE HEIGHTENED FOCUS ON THE ROLE OF MR. BERNSTEIN

Following the military judge's remarks, the trial continued with the balance of PFC B's testimony and testimony from the other military victim, CJ, who had since left the Army. The military judge asked if there were "[a]ny questions of [CJ] concerning any contact he might have had with Mr. B?" Trial counsel responded that he had no questions. In response to questions from defense counsel, CJ noted that he had been in a room with Bernstein and other witnesses, that Bernstein had made a number of remarks which may have been directed at everyone in the room, that Bernstein had referred to appellant as a pedophile, and that in an apparent reference to appellant's guilt, Bernstein had said: "You guys put him away."

The military judge suggested that it would be appropriate for defense counsel to call other persons to testify as to whether Bernstein had influenced witnesses outside the courtroom. Trial counsel disagreed. Without resolving the matter, the military judge began his own examination of CJ in an effort to further explore whether his testimony had been influenced by Bernstein. In the course of his responses, CJ described Bernstein as a person who "[doesn't] think before he

52

talks." When the military judge asked him to explain his opinion, CJ referred to circumstances apparently involving the confrontation between Bernstein and the military judge:

> MJ: Well, let's handle that issue first. Do you care what Mr. Bernstein's opinion is or what he wants you to do in this case?
>
> WIT: I don't care. I really don't care about him. I think he's just a pretty loud fellow.
>
> TC: He turned everybody off--
>
> MJ: Wait. Wait. How would you describe his personality style? How did he affect you?
>
> WIT: I don't think he handles himself very well.
>
> MJ: Why do you say that?
>
> WIT: I think he just--I don't think he thinks before he talks. I think he just reacts.
>
> MJ: Why do you believe that?
>
> WIT: Well, during the course of the day-- well, we--the guy--me and the other people that were in the room off and on caught some things here and there. I didn't really know what was going on. I believe there was an incident with you that he was--that he at one time was getting really loud about. I remember him saying he's going to get himself a $5000 lawyer, which didn't seem practical at all to me.
>
> MJ: There are $5000 lawyers in Killeen.
>
> WIT: I believe it. I not--I just--
>
> MJ: Okay. Go ahead.

53

> WIT:  I didn't think his situation warranted that at all.  I thought he was just reacting.
>
> MJ:  And all the ones in this town that can charge $5000 or more are worth it.  But go ahead.
>
> WIT:  As far as his personality goes, like I said, I just think he's loud and he doesn't--he doesn't think before he speaks.  He just reacts.  However his emotions are going, he just says--just talks without thinking.

After further questioning, the military judge summarized [CJ's] testimony about Mr. Bernstein's conduct in front of the other witnesses in terms of a "desire or hope . . . that everybody [would] kind of hear it in a blow hard kind of way."

When the military judge continued to pursue various theories as to the motivation for Mr. Bernstein's actions, trial counsel stated that he would object to any testimony on the merits along those lines.  The military judge rejected trial counsel's argument, emphasizing that "Mr. Bernstein is the hub with respect to the allegations involving the three people who have never been soldiers."

The military judge then indicated that he was concerned about Bernstein's credibility, noting: "I watched Mr. Bernstein come in here with respect to me to tell me one thing and when we're all over, it was something completely else."  Although the record does not identify the specific incident covered by the

military judge's remarks, it would appear that in the context of

their out-of-court confrontations, he was referring to the

contrast between Mr. Bernstein's apologetic approach in court

and his subsequent allegations that he had been assaulted by the

military judge.

The military judge ruled that the defense would have the

opportunity to challenge Mr. Bernstein's motive and bias, and

that the defense could call witnesses to testify before the

members on the merits with respect to Mr. Bernstein's out-of-

court comments about appellant in front of the other witnesses.

Trial counsel noted that Mr. Bernstein would be required to

testify again if called, because a subpoena had been issued to

him, although there might be some difficulty in obtaining his

appearance.  In response, the military judge emphasized Mr.

Bernstein's central role in the trial:

> MJ:  Happy to sign a warrant of attachment
> if suddenly [Mr. Bernstein's business]
> becomes more important than this court-
> martial.  I'm not trying to be vindictive,
> I'm just trying to say that he's made
> himself an issue in this case, and if he--
> and he's completely told us a thousand times
> "I don't have a subpoena.  I don't have a
> subpoena," when, in fact, he does have a
> subpoena.  And I want this trial--we owe it
> to Sergeant Quintanilla and the others that
> we have this trial and it have closure.

## 14. THE MILITARY JUDGE QUESTIONS
## THE SPECTATORS ABOUT MR. BERNSTEIN

After an exchange with counsel regarding a separate evidentiary issue, the military judge changed the subject and began to question the spectators in the courtroom about Mr. Bernstein, without calling them to the stand to present sworn testimony.  First, he apparently noticed that Mr. Emerick, the Government's expert witness, wanted to say something:

> MJ:  . . . Mr. Emerick, who has patiently--
> the government expert who has patiently been
> waiting, has a question.
>
> MR. EMERICK:  *[From the spectator section.]*
> Well, on this Bernstein thing, I--he
> attempted to engage me in a conversation
> yesterday too.
>
> MJ:  Would you like to come up here and join
> us please.  Well, I'll tell you--wait.
> Wait.  We're killing the reporter.  Has he--
> have you heard anything that he said or did
> with you was it anymore substantial or any
> different than what's been described so far
> since you've been here all along.
>
> MR. EMERICK:  No, I just told him that it's
> inappropriate for us to be talking and left.
>
> MJ:  Great.  I think that some of the
> lawyers might want to talk to you during the
> recess.  And I think that your answer was a
> good one.  Thank you.[12]

---

[12] When Mr. Emerick subsequently testified on the merits, defense counsel asked him whether Mr. Bernstein had approached him on the previous day.  Mr. Emerick testified that he had told Mr. Bernstein that he was a witness and did not want to talk to him about the case.

For reasons that are not apparent in the record, the military judge then decided to engage another spectator, CPT Henry, in a further discussion of the initial incident concerning Bernstein's role in JB's reluctance to testify:

> MJ: . . . Captain Henry, your name has here [sic]. Why don't you just give me a Reader's Digest version of what contract [sic] with Mr. Bernstein apparently was the precipitous event that caused him to prevent the calling of [JB].
>
> CPT HENRY: *[From the spectator section.]* Yes, sir. After Specialist Cooks went in to get the one witness, and I can't remember the young man's name--
>
> MJ: The short guy with the bad haircut?
>
> CPT HENRY: Yes, sir.
>
> MJ: All right.
>
> CPT HENRY: Captain Schwind asked me to go get him. I went into the office, closed door, I had Specialist Cooks with me. [CS] was in the office there and I asked the young man to come with me, that he's been called to the witness chair.
>
> * * *
>
> CPT HENRY: And I asked him to come with me, that Captain Schwind had called him to the witness stand and it's his turn. And Mr. Bernstein said, "No, he's not going anywhere." I asked him who he was. He replied that he was an employer. And I said, "Well, sir, it's my understanding he is the next witness and he has to come with me and take the stand." He said, "No, he's not going anywhere, in fact, we're leaving." I said, "No, sir, it's my understanding you have a subpoena--or he has a subpoena." He

said, "Wrong, that's not true."  I said, "Well, sir, Captain Schwind would like for him to take the stand."  And he started yelling and sticking his finger in my face.  And I said "Well, sir--"

MJ:  Did he assault you, Captain Henry?

CPT HENRY:  No, sir.

MJ:  All right.  Go ahead.

CPT HENRY:  After that I said, "Sir, are you his guardian or parent?"  And he said--start--just kept on yelling.  I said, "Well, sir, you have no say in this right now."  And that's when Captain Schwind came out and asked me to leave.

MJ:  All right.  Now, to your knowledge is this the first that I knew of the events that you had with Mr. Bernstein?

CPT HENRY:  Yes, sir.

MJ:  Was it your impression that he was attempting to prevent the calling of [JB]?

CPT HENRY:  At that particular point, yes, sir, I think he didn't like the order that it was going in.

MJ:  Oh, well.  And what was [JB's] level of emotion in dealing with you?

CPT HENRY:  [JB] didn't say a word--

MJ:  Oh, I'm sorry.  What was Mr. Bernstein's level of emotion?

CPT HENRY:  Very agitated.  Angry.  Yelling.  Excited.

MJ:  Questions for Captain Henry while he's here?

TC:  No, sir.

CDC:  No, sir.

15. THE PROSECUTIONS RECUSAL MOTION, ALLEGING THAT THE MILITARY JUDGE WAS SEEKING TO FORCE AN ACQUITTAL IN ORDER TO AVOID A VERBATIM RECORD

Later in the Article 39(a) session, the military judge considered a defense objection to the proposed testimony of two prosecution witnesses to the effect that appellant engaged in other conduct similar to his conduct with the two military victims.  In the course of considering whether evidence of this uncharged misconduct was admissible, the prosecution argued that it was important for the members to hear from witnesses who had not been contacted by Mr. Bernstein, "[because] the defense has . . . made an issue of the fact that th[e] witnesses . . . are all lying and they are all collaborating among each other . . . maybe with Bill Bernstein, who knows?"

During consideration of the issue, defense counsel stated, "I haven't made an issue of Bill Bernstein aside from . . . I want the . . . people to know he was telling people, but--." The military judge cut him off, noting that the testimony at issue concerned the alleged military victims, not the three alleged civilian victims.  Eventually, the military judge sustained the defense objection, but noted that the evidence would be admissible if the defense opened the door.

Shortly after the military judge ruled in favor of the defense, the prosecution moved that the military judge recuse himself from the trial. The trial counsel argued that the defense had opened the door to admissibility of the uncharged misconduct, but that the military judge would not let the evidence in "because of a side agreement with the defense counsel he's not going to talk about it any more." Trial counsel apparently believed that the military judge was unwilling to adhere to his previous decision to admit the evidence if the defense opened the door, and asserted: "I don't believe, sir, we're getting a fair opportunity to present our case here today."

The exchange between trial counsel and the military judge quickly moved from discussion of an evidentiary objection into a motion for recusal:

> MJ: Want me to recuse myself?
>
> TC: Yes, sir, we do.
>
> MJ: Okay. And, the basis is?
>
> TC: The basis is that right now your relationship with Mr. Carlson is obviously -- we don't know what's going on, sir.

Trial counsel then attempted to explain why he believed the military judge was not fairly applying the rules concerning uncharged misconduct. The military judge responded:

My relationship with Mr. Carlson is simply that I've seen Mr. Carlson in court. He's a hard fighter, but he's a fair fighter. If you want to recuse me for that basis, that's fine. I'll tell you, I think the same of you.

The military judge attempted to explain why he disagreed with trial counsel's position on the uncharged misconduct issue, which led to the following exchange:

TC:  Again, sir, you told us earlier that if the facts change we get a different ruling as well.

MJ:  Okay.  Then maybe you don't get it, Captain Schwind, they ain't changed enough for me.

TC:  Sir, then in that case we request you recuse yourself on the basis that we feel you do not want a verbatim transcript of this trial made.

MJ:  That's so ridiculous I'm not even going to address it.  Do you have another basis?

TC:  No, sir.

MJ:  I've been accused of many things, but being a gutless judge is not one of them.

TC:  Sir, the way you talk to Mr. Carlson-- we were going over this--we really believe that the government, if we still have the burden and I think we still do, we're not getting a fair shot at putting on the evidence to prove that up.  And, attempt to prove, beyond a reasonable doubt, each and every element that you still instruct and that the defense has put in issue with their cross-examination.

MJ:  If I were your rater or commanding officer I would send you home for the

> weekend to write me a tome on 403. It
> appears to me you don't understand it so
> therefore I don't want to discuss it.
> Overruled. Sit down. Call the members.

Faced with a decision by the military judge to not recuse himself, the trial counsel sought a different forum for addressing his evidentiary objection, which led to the following colloquy with the military judge:

> TC: We request leave to consider a
> government appeal, sir.
>
> MJ: Oh, really?
>
> TC: Yes, sir.
>
> MJ: You--What [sic] a second. Stop. Okay.
>
> TC: All we need is two hours, sir.
>
> MJ: Pardon me?
>
> TC: We got to have a conference with some
> people. Two hours to make that decision one
> way or another on the particular ruling on
> the 404 and 413 evidence . . . .
>
> MJ: Two hours. So, I should send the jury
> home for two hours?
>
> TC: Yes, sir.
>
> MJ: Okay. And, the appeal would be based
> upon what, the 403 ruling?
>
> TC: The 403 ruling and your decision not to
> recuse yourself, as well, from this trial.

The military judge decided to continue the discussion with one of the spectators, Captain Henry, rather than counsel:

> MJ: Captain Henry, have you talked to GAD[13] about this?
>
> CPT HENRY: *[Seated behind the bar.]* No. Sir.
>
> MJ: Okay.  Let's take 10 minutes.  You call the chief of GAD and you say the military judge made a rule to keep out uncharged misconduct based upon Rule 403.  Do you want to play 403 at all?  Call them, see what happens.  Ten minutes.

These remarks were followed by a 30-minute recess.  When the Article 39(a) session reconvened, the military judge began with an apparent reference to an off-the-record discussion, the meaning of which is not entirely clear from the record:

> My understanding is that you haven't had sufficient time because of availability to keep her, so now to get a preliminary call what you want to do [sic].

The military judge asked the parties for their views as to whether the proceedings should continue while he considered whether his rulings were subject to an appeal by the Government under RCM 908(a).  Both parties agreed that the trial should proceed while the military judge took the government appeal issue under advisement.

The prosecution proceeded with its case on the merits.  After several witnesses testified, trial counsel asked for an Article 39(a) session.  Before acting on that request, the military judge addressed the spectators and asked CPT Henry

---

[13] The Government Appellate Division.  <u>See</u> Art. 70, UCMJ, 10 USC § 870.

whether there would be an interlocutory government appeal. CPT Henry provided an ambiguous response, indicating either that a decision had not been made or that an interlocutory appeal would not be filed. At that point, the military judge convened an Article 39(a) session, at which he reiterated his decision to sustain the defense objection to presentation of uncharged misconduct. After considering several other matters, the military judge granted defense counsel's request for a brief recess prior to presentation of the defense case on the merits.

### 16. THE MILITARY JUDGE'S WARNING TO THE MEMBERS TO AVOID READING STORIES IN THE LOCAL MEDIA

Before the defense could proceed with its case, the military judge called an Article 39(a) session to advise the parties of the latest developments concerning Mr. Bernstein:

> I have been reliably informed that Mr. Bernstein has gone to the newspapers to tell his story of my assaulted [sic] behavior toward him. And, secondly, he has filed a complaint this morning with the military police, charging me with assault and I don't think I need a lawyer [chuckles]. In any case, if I did, it would cost less than $5,000.

Without asking for a reaction from the parties, the military judge changed the subject and initiated a discussion concerning the presentation of the defense on the merits. Defense counsel, however, remained concerned about Mr. Bernstein:

> CDC: There's allegedly an article going to be published in the Killeen paper now.
>
> MJ: I will tell the members not to read the newspaper.
>
> It will be about me. The members, to my knowledge, know nothing about Mr. Bernstein and Captain Henry and Colonel Hodges.
>
> CDC: Okay, sir. I just want to make sure -- that's fine.
>
> MJ: I'll make it very generic.
>
> CDC: Okay. Yes, sir.

When the members assembled, the military judge provided a generic instruction to avoid exposure to the local news, which was supplemented upon request from defense counsel:

> MJ: . . . I instruct you that you will not listen to the local news tonight. Just do something else. And, that you will not read any local paper, that means not only the Killeen paper, but Austin, Temple, Belton. I do that only because there is the possibility, however slight, that somebody might put something in the paper. I have no idea if or what they might say, but I just want to make sure that all sides get a fair trial. Any questions about that? So just suck it up, tell you[r] wives or loved ones or you[r] dog or whoever brings the paper to you that just put it aside and you'll pick it up later on. Alright. Thank you. Mr. Carlson, is there any evidence the defense would like to present?
>
> CDC: Sir, yes, but in your instruction you were going to indicate, I believe that it has nothing to do with the trial or the people in the trial --
>
> MJ: Right.

65

CDC: -- beside from yourself.

MJ: Right.  It's purely prophylactic; that is, protective.  In the event that somebody wants to write an article about Mr. Carlson or about me or about Captain Henry or about somebody else, that you might possibly relate to this trial.  Just -- I don't know if they will, I'm just guessing that there is that possibility.  When a trial goes more than a day or 2, people sniff around and they might write articles and I just don't want you to have to wrestle with that.

### 17. THE DEFENSE CASE FOCUSES ON MR. BERNSTEIN'S INFLUENCE ON THE WITNESSES

The first defense witness was Sergeant (SGT) Melton, who had lived with appellant for a period of time.  Defense counsel's questioning immediately focussed on whether Mr. Bernstein had attempted to influence the testimony of the Government's witnesses in the waiting room during trial:

Q. [Defense Counsel:] Did he [Bernstein] tell them [the witnesses in the waiting room] to respond different to the government as opposed to when I ask them questions?

A. [Sergeant Melton] Yes sir, he said, "When you [defense counsel] ask questions, simply say yes or no, and when the government ask[s] questions go in depth in the answer," sir.

Q. Did he tell them how their demeanor should look as they come in the courtroom and whether they should face the jury or how they should look?

A. He told them, "Be serious and solemn and not to smile," sir.

Trial counsel's cross-examination of SGT Melton sought to demonstrate that Mr. Bernstein had been speaking generally to all the witnesses and that the remarks had not influenced Melton.

After the defense finished presenting its case, the prosecution sought to revisit the military judge's ruling excluding evidence of uncharged misconduct. The military judge, during an Article 39(a) session, declined to change his view that the evidence in question was unduly prejudicial under Mil. R. Evid. 403. The prosecution also sought to have the uncharged misconduct admitted on the grounds that the prosecution needed to rebut the defense theory that the witnesses had been tainted through their out-of-court contact with Mr. Bernstein. In the course of that argument, the prosecution emphasized that Mr. Bernstein's conduct outside the courtroom had become a central issue in the case: "The defense has gone with this theory, not just weakly put it out there, they have gone with this hard, bringing the whole trial s[a]ga that went on outside this courtroom. They relied on that theory heavily." The military judge countered that the Government could rely on the testimony of the two military victims of the charged misconduct, who had not been associated with Bernstein, and did not need further evidence in the form of uncharged misconduct to rebut the defense theory that Mr. Bernstein had influenced the testimony

67

of the witnesses.  After further discussion regarding instructions, the military judge recessed the court-martial for the evening.

18. THE COURT-MARTIAL CONSIDERS PRESS COVERAGE OF THE CONFRONTATIONS BETWEEN THE MILITARY JUDGE AND MR. BERNSTEIN

Shortly after the court-martial reconvened on the morning of August 22, the military judge noted that defense counsel had "an issue with respect to a newspaper article this morning," and directed trial counsel to include an article from the Killeen Daily Herald in the record as an appellate exhibit.  The article, headlined "Killeen Man Files Complaint Against Judge," stated that Mr. Bernstein had filed a "simple assault" complaint against the military judge.  Based upon information from the installation's public affairs office, the article summarized the proceedings, noted that the military judge had "put the incident on the record," and observed that "[n]o motions were filed" concerning the incident.  The article also stated that "military authorities are investigating the incident" and attributed the following to Mr. Bernstein:

> "I filed the complaint because I feel the gentleman had no right to touch me." Bernstein said Wednesday.  He said the incident occurred when he, along with another witness, were waiting outside the courtroom.
>
> Bernstein said Hodges came from the courtroom trying to "verbally force one of

68

the witnesses to testify." Bernstein said he entered into the discussion when the military judge turned to him and "smacked me on the left hand side of my chest four times."

During the incident, Bernstein said the judge informed him to "stay out of this. This is not your business." Bernstein also alleges that the judge used profanity.

## 19. DEFENSE SEEKS TO IDENTIFY A RELATIONSHIP BETWEEN THE CONFRONTATIONS AND THE MERITS OF THE CHARGES AGAINST APPELLANT

The defense counsel then presented a summary of his understanding as to what had transpired between the military judge and Mr. Bernstein at trial. Although it appears that he was summarizing what the military judge previously had placed on the record during the Article 39(a) session with Mr. Bernstein on the previous day, it is not clear which parts of the defense counsel's description were based upon the military judge's summary and which parts were based upon defense counsel's observations. Defense counsel did not clearly articulate his purpose in raising the issue, and the military judge did not clarify the information or the purpose for which it was being offered. It appears, however, that he was laying the groundwork for subsequent introduction of evidence that would contrast the information in the record of trial about the incident with Mr. Bernstein's comments to the press. Although not articulated at this point in the record, it appears that the defense wanted to

69

discredit Mr. Bernstein by showing his penchant for exaggeration.

#### 20. THE CONFRONTATIONS BETWEEN THE MILITARY JUDGE AND MR. BERNSTEIN BECOME THE SUBJECT OF A STIPULATION FOR CONSIDERATION BY THE MEMBERS ON THE MERITS

Defense counsel told the military judge that he had approached the Government with a proposed stipulation of fact regarding the incident, "so we can get on with our closing and get this trial in to the jury." Trial counsel advised the military judge that the prosecution declined to enter into the stipulation because it viewed the information as irrelevant. The military judge then focused on Mr. Bernstein's relationship to the charged offenses:

> MJ: Do you know where your Achilles' heel is in this case?
>
> TC: Oh, yes, sir.
>
> MJ: Where do you think it is?
>
> TC: It is wherever Mr. Bernstein is this morning sir.
>
> *[The parties chuckle.]*
>
> MJ: That's right. And, the problem is that Mr. Bernstein . . . is . . . a control freak. . . . The point is, is that he controls [JB]. Whether it's improperly or not, is not important to me because that's decided by the members.

The military judge added that if live testimony was needed, CPT Henry could testify that Mr. Bernstein "went ballistic" and

70

"attempted to intercede" when he learned that the testimony would not proceed in the way Bernstein anticipated. Trial counsel said that he would stipulate to that fact, but would not stipulate to Mr. Bernstein's actions after he testified in terms of complaining to the command, the MPs, and the press. The military judge replied that he viewed Mr. Bernstein's behavior as relevant to showing "the depth in his control" over JB. The military judge added that information was relevant to show the "depth of his commitment" to "his cause, whatever it may be" because it would demonstrate that

> after apologizing in court and saying, "It
> didn't happen," or words to that effect, and
> schmoozing everybody in the courtroom, he
> left that night, talked to General LaPorte -
> - I am told -- What he said, I don't know --
> and that night or the following day went to
> talk to either the PAO or the press . . . .

The military judge's comments led to the following exchange with trial counsel:

> MJ: [D]oesn't that show you a guy who is
> committed to whatever his agenda is?
>
> TC: Well, not necessarily sir. He's
> committed to getting back at you and for
> touching him . . . and offending him in that
> matter --
>
> MJ: -- You can argue that --

Trial counsel added that Mr. Bernstein's comments to the MPs and the press concerning his confrontation with the military judge were not relevant to

> what the accused did to a close friend of
> his, [JB].  There's no connection there
> between that.  He got upset because of what
> happened to him, and he was willing to
> follow through even after taking the stand
> and saying he was ---

The military judge interrupted trial counsel's argument, began to read the proposed stipulation, and inquired about Mr. Bernstein's availability to testify.  When it appeared that there might be some delay in obtaining Mr. Bernstein's testimony, the military judge asked defense counsel whether he would prefer to have Mr. Bernstein return to the stand.  Defense counsel replied that he would be glad to have Mr. Bernstein testify, but indicated that he would prefer to proceed by stipulation rather than to have a delay in which the members might "forget the testimony they heard."

After declaring that "Bernstein is inextricably linked to some major issues in this case," the military judge asked trial counsel if the prosecution was willing to stipulate.  Trial counsel reiterated the prosecution's unwillingness to stipulate. The military judge made it clear that Mr. Bernstein's activities were relevant, and that in the absence of a stipulation, Mr. Bernstein would have to testify.

### 21. THE PROSECUTION IDENTIFIES THE MILITARY JUDGE AS A WITNESS ON THE MERITS

Trial counsel responded by making it clear that if the confrontation between the military judge and Mr. Bernstein was relevant to the merits of the case, the military judge could become a witness in the proceedings.  The military judge reacted by suggesting that if there was no stipulation, there might be a mistrial that could preclude further proceedings:

> MJ: [I]f you call me, you get to try this case all over again, and you get to figure out whether or not you want to wrestle with double jeopardy.  What do you want to do, Captain Schwind?
>
> TC: Sir, if they put Mr. Bernstein on, and he recalls events differently we'll have -- to try to point the finger at you.
>
> MJ: Then I'm sure you'll stipulate.  You can do what you want to, Captain Schwind.  I'm going to let you roll this dice any way you want to.  Just like we did on the appeal issue the other day, I just want you to think it through.

### 22. THE MILTIARY JUDGE CONSIDERS DISQUALIFICATION BUT DECIDES NOT TO RECUSE HIMSELF

In a further discussion about Mr. Bernstein's complaints to the command and the press, the military judge emphasized that his confrontations with Bernstein were relevant because "the degree to which the three non-soldier alleged victims are under the control of anyone -- you, the defense, Mr. Bernstein, anybody else -- is an issue in this case.  It's obvious to

everybody in this courtroom." Trial counsel disagreed with the theory that Bernstein's complaints about the military judge were relevant to the merits of the case. The military judge responded:

> The trial is whether or not the three young men are telling the truth, as well as Mr. Bernstein. And, a question of whether or not those young men are telling the truth, that is, their credibility, depends on who was driving the train.

Trial counsel then reformulated his objection under Mil. R. Evid. 403, contending that even if Bernstein's complaints were minimally relevant, evidence about those matters would "confuse the issues, mislead the panel, and it's going to unfairly prejudice the Government's ability to put on a case." After rejecting the prosecution's argument, the military judge provided the parties with a copy of the stipulation, reflecting his proposed changes. In one of the changes, he proposed to delete references to himself and substitute the phrase "court official." Trial counsel agreed, but defense counsel thought it was important to refer to the "military judge." Defense counsel's insistence that the stipulation expressly refer to the confrontation between Bernstein and the "military judge" caused the military judge to ruminate about the subject of recusal:

> MJ: Well, now I have to decide whether or not I should recuse myself notwithstanding no motion by anybody [sic]. Do you think that your position in this case -- your

74

> position in how you complete this case is
> going to interject me as a victim?

Defense counsel assured the military judge that he was not going to portray the judge in that manner, but also added that it was important to the defense that the members understand that the incident involved Bernstein and the military judge, "the senior person around here."  The military judge made a further attempt to persuade the defense counsel to change the references in the stipulation to a "senior field grade judge advocate" or a "senior field grade member of the Judge Advocate General's Corps," but the defense counsel declined to agree to such a change.

After the parties and the military judge reviewed the substance of the stipulation, they then considered whether it should be treated as a stipulation of testimony, which would be read to the members but not sent to the deliberation room, or a stipulation of fact, which could either be read to the members or sent to the deliberation room, or both.  See RCM 811(f). Eventually, the military judge determined that it was a stipulation of fact, and offered the following reflection on the tenor of his dealings with trial counsel:

> It appears to me, Captain Schwind, that it
> would be very reasonable for you to believe
> that I've mugged you at every corner and not
> done the same to the defense; and that's not
> an unreasonable perception. . . .  So, I
> tell you that any pressure you felt to

stipulate to Mr. Bernstein's testimony, I extract and remove. And, I want you to do what you want to do. . . . And, I'm willing to do what it takes to get [Mr. Bernstein] here. What do you want to do? Talk to Captain Henry.

The trial counsel quickly responded that the prosecution had "no interest in bringing Mr. Bernstein back into the courtroom."

23. THE STIPULATION'S DESCRIPTION OF THE CONFRONTATIONS BETWEEN THE MILITARY JUDGE AND MR. BERNSTEIN

The members returned to the courtroom, and the military judge proceeded as follows:

MJ: And, I'm now going to give you - - read to you a stipulation of fact, which I think will at last explain to you why you've been held in abeyance as we struggled with this issue.

You're advised that a stipulation of fact is an agreement between the prosecution and the defense, with the express consent of the accused, that what I'm about to read to you are the uncontradicted facts or are uncontradicted facts in this case.

[Reading:] "[JB] was called as a witness by the prosecution - - And, you'll also have this with you in deliberation. You're getting it now so that you'll understand counsel's argument.

[Reading:] "[JB] was called as a witness by the prosecution. When he was called, he did not immediately appear in the courtroom. The bailiff entered the courtroom to tell Captain Schwind that he, [JB], refused to testify. The military judge called a brief recess to find out what was happening.

76

The military judge went to the witness waiting area to determine if this witness did want to testify. There was a confrontation with Mr. Bill Bernstein who tried to prevent [JB] from testifying. He was very agitated and threatened to take action. The military judge touched Mr. Bernstein in an effort to get his attention. Mr. Bernstein calmed down and allowed [JB] to testify.

The same day Mr. Bernstein contacted the military judge's superior and told him, the superior, that the judge had assaulted him and cursed him.

A session was held outside of the panel where Mr. Bernstein apologized for his temper and the whole situation. He said it was merely an act of frustration on his part, and further said that he had no problem with the military judge. He added that the incident was behind him.

That evening Mr. Bernstein contacted several people on Fort Hood, including senior officers, to tell them that he was assaulted and cursed. He said that he was not treated with the proper respect. He went on to add that we, in quotes, "did not know who he was; and that, he had very powerful friends."

Mr. Bernstein then filed a complaint with the Fort Hood Military Police against the military judge for assault. He also went to the Killeen Daily Herald newspaper, and as a result of this visit - - that visit, an article was published in today's edition of the daily newspaper. The article accused the military judge of assault and using foul language in his presence.

After reading the stipulation, the military judge provided the following guidance to the members:

77

Now, the parties will tell you why they think that's important. That's not my job, but let me tell you what's very important, and then I have a couple of questions for you.

I'm not a witness to this case. My credibility is not an issue. What happened with respect to the stipulation of fact in terms of my role - - my question to you is: Does that bother anybody?

MEMBERS: *[Appear to respond in negative.]*

MJ: Do you understand that my job is as the sole source of the law; however, I cannot give you the law effectively and cannot expect you to follow the law if you have reservations about whether or not the guy giving you the law might be out of his mind?

MEMBERS: *[Appear to respond in negative.]*

MJ: Any reservations whatsoever?

MEMBERS: *[Appear to respond in negative.]*

MJ: Negative reply from the members.

I also want you to appreciate that you understand that my role, with respect to that stipulation, was not an attempt to help either side, not an opinion on my part as to what was proper or improper, a good tactic or a bad tactic; that, my role, my involvement, in that was simply to do what I've been trying to do since the beginning of this trial, and that was to get the witnesses and the evidence moving; in other words, a logistical matter and nothing more. Does everyone understand that?

MEMBERS: *[Appear to nod in affirmative.]*

24. CONSIDERATION OF THE CONFRONTATIONS DURING CLOSING ARGUMENTS

After a brief summary of the prosecution's evidence, the Government promptly turned to the confrontations between Mr. Bernstein and the military judge, in an effort to preempt the defense reliance on the stipulation:

> What was the defense case?  What was their argument.  Well, you can tell.  You can tell from what came in today.  Their scant evidence was that a Mr. Bernstein, a pompous, civilian know-it-all, as it seems, in their opinion, masterminded the trial to bring down Sergeant Quintanilla . . . .

Trial counsel acknowledged that Mr. Bernstein "probably" was "misguided," but contended that it was not logical to assume that he controlled the prosecution witnesses.  He emphasized the fact that Mr. Bernstein had not played any role in the allegations made by the two military complainants, and that he had not discussed any specifics with RW or RW's father.

After a further discussion of the evidence supporting the charges, trial counsel returned to Mr. Bernstein, describing him as "arrogant," "conceited," and "a loon . . . [whose] personality offends a lot of people."  With respect to the stipulation, trial counsel stated that

> [Bernstein] was so angered about what happened at the hand of the military judge that . . . he couldn't just go home and sleep it off.  He calls the police:  "I've just been assaulted by a judge."  He calls the newspaper:  "I've just been assaulted by a judge and he used profanity against me" .

79

. . . Maybe some of you are waiting for the
military police to come in here and take the
judge off the stand. I don't know.

The military judge interrupted trial counsel's argument at that

point:

Yeah, leave me out of it gentleman. My
credibility is not at issue. . . . I'm not
chastising you, Captain Schwind, for your
argument. . . . I just want to make it clear
the stipulation of fact is a fact. It's
uncontradicted. It's there. It happens.
Stuff like that happens to all of us, but
the fact that it happened to the judge in
the case is not important. It's certainly a
fact that you shall consider in your
deliberations, but it's not important in
terms of how it affects me or the law or
anything else; just how it affects how you
see Mr. Bernstein and his activities.

During the balance of his argument, trial counsel

emphasized that Mr. Bernstein had no influence on the two

military victims and that he simply told RW's father that he

should contact law enforcement authorities without suggesting

the details of any offense. With respect to JB and CS, trial

counsel did not endeavor to rebut the defense evidence of Mr.

Bernstein's influence, but instead focused on the specific

evidence of the alleged offenses against each.

Defense counsel's closing argument repeatedly emphasized

Mr. Bernstein's role in the prosecution of the charges, both in

terms of his contacts with JB, CS, and RW's father before the

allegations were presented to the military authorities, as well

as his attempts during trial to influence witnesses in the
waiting room.  Defense counsel specifically relied on the
stipulation concerning the confrontations between the military
judge and Mr. Bernstein as a means of attacking Mr. Bernstein's
credibility:

> The stipulation of fact you get:  Did I know
> about that before we started when I told you
> [in the opening statement] he was going to
> be a force in this trial?  I didn't know
> that.  I'm not making this stuff up.  This
> is offered so you know what kind of force
> this guy is.  He's dominating [JB] in the
> witness room.  "He ain't coming out guys.  I
> don't like how you're doing this.  When you
> convince me, he'll come out."  This kid
> isn't a puppet?  This is a stipulation of
> fact.  This is uncontroverted.
>
> Is he on a power trip?  Is it because
> of a power trip possibly?  Does he want to
> be in the paper because of this stuff? . . .
> [I]t doesn't matter what kind of authority
> is around, he's going to be abusing it.

Continuing his emphasis on the stipulation regarding the
confrontation, he said:

> And, I got one other thing for you that we
> all know now because of this.  And, I didn't
> know this at the beginning of the trial, but
> . . . now I've got proof.  He even knows how
> to push the military's buttons. . . .
> Somebody pisses him off, he calls the
> commander.  He goes to the MPs's. . . .
> And, what does he do when he allegedly finds
> out [JB has been] assaulted?  He doesn't go
> to the Killeen police . . . . He goes to CID
> because he knows that's how you get him.

With respect to the charges involving the three civilians, defense counsel's closing argument focused primarily on Mr. Bernstein's influence.  In terms of the charges involving the two military personnel, defense counsel primarily challenged their testimony and the testimony of other government witnesses. Counsel did not develop any significant relationship between Mr. Bernstein's activities and the military victims.

## 25. THE VERDICT

The members acquitted appellant of the charges involving two of the three civilians, JB and CS, and convicted him of forcible sodomy upon the other civilian, RW.  In addition, the members convicted him of indecent acts and indecent assault offenses involving the two military victims.

## B. POST-TRIAL PROCESSING

Appellant was sentenced on August 22, 1996, to a bad-conduct discharge, confinement for three years, forfeiture of $300 pay per month for 36 months, and reduction to the lowest enlisted grade.  The Staff Judge Advocate's post-trial recommendation to the convening authority -- the commander of the 1st Cavalry Division -- was served on defense counsel on February 3, 1997.  Defense counsel's post-trial submission to the convening authority under RCM 1105 and 1106 requested disapproval of the findings, based upon a variety of alleged

errors.  The defense also requested that the post-trial responsibilities be transferred to an "off-post" convening authority.  The submission included the following references to Mr. Bernstein and the military judge:

> During this trial, a government witness, Mr. Bernstein, sat in the waiting room and coached the government witnesses on how to testify and what to say.  During the trial, both the trial counsel and defense counsel requested that the military judge recuse himself for lack of impartiality.  The military judge, trial counsel, chief of the 1st Cavalry Division criminal law section, 1st Cavalry Division SJA, 1st Cavalry Division Commander, III Corps SJA, and the III Corps Commander all became directly involved in this case through their contact with Mr. Bernstein during the trial, making them all potential witnesses.  In fact, the military judge advised the trial counsel to have these post trial matters handled off-post because of the involvement/contact of the listed officers in this matter. SSG Quintanilla was unable to obtain a fair hearing in this atmosphere.

The SJA, in an addendum to the convening authority, advised the convening authority that: (1) he, the SJA, was not disqualified because he had merely listened to Mr. Bernstein's complaints; (2) the convening authority was not disqualified because he had not spoken with Mr. Bernstein; and (3) there was no evidence in the record that Mr. Bernstein ever spoke to the III Corps Commander, "or what may have been said."  The SJA also noted that the military judge had assumed erroneously that Mr. Bernstein had spoken to the convening authority.  Defense

counsel's reply emphasized that he was not present during Mr. Bernstein's conversations with the command and that the details of those conversations were not reflected in the record of trial.

Subsequently, when a different general officer was designated as the acting commander of the 1st Cavalry Division, that officer assumed the duties of the convening authority in appellant's trial. The new convening authority decided it was impractical for him to act on the case, citing the material submitted by defense counsel as well as the comments of the SJA, and forwarded the record for action by the III Corps Commander.

At III Corps, the Chief of the Criminal Law Division prepared a memorandum for the SJA describing Mr. Bernstein's interaction with both commanders and judge advocates:

> Mr. Bernstein thought that the government counsel was pressuring his employee to testify and he called you to complain. At trial, Mr. Bernstein became upset, also refused to testify, and contacted or attempted to contact the 1st Cavalry Division Staff Judge Advocate, the Division Commander, you, and the III Corps Commander to discuss his and his employee's continued presence and participation at trial.

The memorandum provided the following description of Mr. Bernstein's confrontation with the military judge:

> During the course of the court-martial, Mr. Bernstein and the military judge, COL Keith Hodges, engaged in a public, verbal altercation outside the courtroom over his

84

> refusal to testify. This ultimately ended
> in Mr. Bernstein's filing of assault charges
> against the military judge.

The memorandum also stated that Bernstein "contacted the III Corps Commander after conclusion of the trial to discuss the incidents noted above." After noting the military judge's recommendation that the case be transferred to an "off-post" convening authority for post-trial action, as well as the defense counsel's request to the same effect, the memorandum recommended that the case be transferred to the Commanding General of U.S. Army Forces Command, Fort McPherson, Georgia, "to preclude any question of unfairness in the proceedings." The III Corps Commander adopted that recommendation and forwarded the record to his superior, the Commander of U.S. Army Forces. In his transmittal memorandum, the III Corps Commander stated:

> One of the key witnesses in this case
> initiated several conversations with me and
> my Staff Judge Advocate. The circumstances
> surrounding those conversations, coupled
> with the emotional environment in which this
> case was tried, lead me to concur with the
> military judge's recommendation to forward
> the record of trial to you. I believe that
> this avoids any question of unfairness in
> the proceedings and ensures that the justice
> system remains inviolate.

The post-trial record does not set forth the details of the conversations between the III Corps leadership and Mr.

Bernstein, nor does it explain the conflict with the earlier addendum, which had suggested that there were no such conversations.

The post-trial recommendation subsequently prepared by the SJA at Forces Command included a summary of the reasons the case had been transferred from Fort Hood. The summary noted that the military judge had recommended post-trial action by an "off-post" convening authority, "after he had become involved in an out-of-court confrontation with a prosecution witness." The recommendation summarized the findings and sentence and recommended approval. The defense submitted a response that primarily incorporated the matter previously submitted to the convening authority at Fort Hood, and the SJA at Forces Command provided a brief addendum simply noting his disagreement with the defense submission. On July 21, 1997, eleven months after trial, the convening authority approved the findings and sentence.

## C. ADDITIONAL EVIDENCE CONCERNING THE CONFRONTATIONS DISCLOSED DURING APPELLATE REVIEW

During review by the Court of Criminal Appeals, appellant sought to determine whether any additional evidence concerning the confrontations had been generated as a result of separate investigations into the confrontations between the military judge and Mr. Bernstein. Although the Government initially

rebuffed these requests, the defense eventually was provided with a number of documents in October 1998, more than two years after trial. The documents included the following material, which had been provided by the participants to military police investigators during the court-martial and in the days immediately following the trial's conclusion on August 22, 1996: (1) a statement by the military judge on August 28, accompanied by a memorandum prepared by the military judge; (2) a statement by the trial counsel on August 27 and trial counsel's memorandum for the record dated August 26; (3) two statements by the bailiff on August 27; (4) statements by Mr. Bernstein and JB on August 22, provided shortly after midnight on the day of the confrontation. In addition, the civilian defense counsel, Mr. Carlson, executed an affidavit concerning these matters on November 16, 1998.

### D. DESCRIPTIONS OF THE CONFRONTATIONS OUTSIDE THE RECORD OF TRIAL

#### 1. THE MILITARY JUDGE

The statement provided to the MPs by the military judge, and his accompanying memorandum, provide details about the confrontations beyond those set forth in the record. According to the military judge's memorandum, when the Government called JB as a witness, the bailiff returned after "about 5 minutes" and said "something to the effect that the witness wasn't

coming." The military judge sent trial counsel to assist the bailiff, apparently to no avail. The memorandum does not reflect whether the military judge had any conversations with the bailiff or counsel as to the nature of the problem.

At some point, the military judge became concerned about the impact of the delay on his responsibility for the efficient conduct of the trial, and decided it was necessary for "the witness to come as called or else have someone make a decision what would be done next." His memorandum notes: "I recessed the court, took off my robe, and went to inquire why it was taking so long to get the witness into the court room." He added: "Knowing that I was about to potentially have contact with a witness, I took a counsel from both sides with me: CPT Schwind [the trial counsel] and Mr. Carlson [the defense counsel]." In his statement to the CID, he stated that Schwind and Carlson "came with me to the room and were either inside or in the doorway. I had my back to CPT Schwind and Mr. Carlson." As noted in section III.D.3., infra, Mr. Carlson's post-trial filing disputes this account and asserts that he was not present for any of the events involving the military judge and Mr. Bernstein.

The military judge's memorandum states that he located Mr. Bernstein and JB and identified himself as the military judge. He viewed the situation as "tense but not violent or building in

that direction at all."  Mr. Bernstein first complained that he had not been treated properly by CPT Henry, the Chief of Military Justice for the 1st Cavalry Division, and then told the military judge that he objected to having JB called as a witness.  The memorandum states that the military judge "politely" informed Mr. Bernstein that the decision whether to testify belonged to JB, that Mr. Bernstein replied by telling the military judge that JB was not under subpoena, and that Mr. Bernstein became "rather emotional."  The memorandum indicates that the military judge was not aware that the trial counsel had not issued a subpoena to JB.

In the memorandum, the military judge notes: "I believed we would have a more productive discussion if the level of emotion was toned down a bit."  In furtherance of that goal, "I felt comfortable enough with him to simply place both of my hands, palms open and toward him, on the upper fourth of his chest and my fingers on his shoulders and simply pat him twice and say to the effect, 'Mr. Bernstein, calm down.  Let's go to court.'"  In his statement to the MPs, the military judge stated that he did not use any profanity during the initial confrontation.

The memorandum states the military judge informed JB that he could either "testify now or testify at some other time later -- possibly much later -- after a subpoena was served."  JB

replied he wanted to testify now, and the military judge

returned to the courtroom.

The memorandum indicates that a second confrontation

occurred when JB did not appear and the military judge became

"impatient."  The military judge decided not to direct the trial

counsel to locate the witness "because it is hard to get lawyers

back in once they leave."  Instead, the military judge "simply

left the bench and again went to inquire as to the delay."  In

contrast to his description of the first confrontation -- which

states that he brought counsel for both parties with him because

he was going to be dealing with a witness -- the military

judge's memorandum notes that during the second confrontation he

was accompanied only by the bailiff, SPC Cooks. The memorandum

contains the following description of the second confrontation:

> As I walked in, Mr. Bernstein immediately
> told me he was talking to LTG Schwartz.  His
> tone and demeanor was again "high," that is,
> he was worked up on what I saw as a simple
> matter and one we had earlier resolved.  He
> had his hand over the mouth piece.  I told
> him that it didn't matter to me for it was
> my job not to do the commander's bidding, I
> could not do what LTG Schwartz said, and my
> chain of command was my senior judge or
> words to that effect.  It then became
> apparent he was on hold.  Mr. Bernstein
> apparently tired of holding and hung up the
> phone.  As Mr. Bernstein began to tell me
> about all his contacts in Killeen and on Ft
> Hood, I told Mr. Bernstein, "I don't f***ing
> care what others tell me to do."  I was
> supposed to follow what I believed was
> right. . . .

90

> . . . My inappropriate and unnecessary use
> of the profanity remarkably changed the
> nature of my contact with Mr. Bernstein.  He
> paused, smiled, and said to [JB], "I like
> this guy.  He uses the F-word." (He might
> have said the whole word, I am unsure.)  The
> conversation returned to cordial, and Mr.
> Bernstein then wished to persuade me to do
> something to avoid [JB's] being called.  I
> finally explained to Mr. Bernstein that
> since he was not in a parental-like
> relationship with [JB] and he was preventing
> the government from calling a witness, he
> could be held in contempt if he interfered
> with the trial.  We agreed that [JB] could
> make his own decision.  Mr. Bernstein then
> wished to close the door (leaving SPC Cooks
> outside) to ask something of me.  I stayed
> in the doorway so not to exclude SPC Cooks.
> Mr. Bernstein, in a friendly and inoffensive
> manner, held on to me and said to the
> effect, "Please, please don't let them give
> [JB] a hard time," and something about not
> revealing [JB's] home address.  I simply
> replied something to the effect of, "We'll
> just follow the rules."

In the memorandum, the military judge noted that he could not be sure whether his physical contact with Mr. Bernstein occurred during the first or second confrontation, stating "[i]t simply was not significant enough even to be memorable in terms of which visit it occurred."

In his statement during the MP investigation, the military judge added that he had called for MPs to be present after either the first or second confrontation:

> As I left CPT Schwind's office the first or
> second time (I believe the second) I told
> CPT Henry (I believe) to have MPs present.

I did that to prevent any possible problems because Mr[.] Bernstein kept saying that [JB] and the others were afraid of the accused and I had concern about contact between the accused, JB, and Bernstein.

In his memorandum, the military judge offered the following summary regarding his responsibility:

a. I deny that I committed an assault for I know he [Mr. Bernstein] was not offended by my touching him. That is clear to me from my interaction with him and he with me. My touching was, under the circumstances as I saw and know them to be, appropriate to our "relationship" and in an effort to calm the situation.

b. That Mr. Bernstein might not have been offended by my profane word, it does not excuse my having used it especially under the circumstances. It was not an insult to him or anyone else, just very bad taste.

c. I did unnecessarily place myself in a position where an assault allegation, however groundless, could be made.

d. Notwithstanding my style to take an active responsibility to keep a trial moving, I should not have directly involved myself in a matter that was occurring outside the courtroom but rather have left it to the parties. I admit the better course would be simply to have taken a less active, passive approach. My motive was to keep the trial moving; I should have used a different method.

e. I assumed the risk by touching Mr. Bernstein however well intentioned. I have touched hundreds in the same positive, friendly, and encouraging way. It takes such an event to fully appreciate the risk at hand. I understand.

92

## 2. THE TRIAL COUNSEL

Trial counsel's description of the two incidents provides
significant details not set forth in the record or in the
military judge's post-trial statement and memorandum.  In
particular, trial counsel describes the military judge as being
much more emotional and confrontational in his dealings with Mr.
Bernstein.

Trial counsel's memorandum for the record notes that he met
with Bernstein on August 19, the day before trial on the merits:

> We have a long discussion re whether he or
> [JB] must appear in court.  I say no,
> because my policy is not to subpoena my own
> witnesses.  Bernstein seems cooperative,
> saying he will appear with or without [JB]
> and he will try to get [JB] to come to court
> with him.

Referring to a telephone conversation that evening,
the memorandum states:

> I again assure him there is no subpoena for
> his or [JB's] appearance.  He makes me
> guarantee that I will protect [JB], then
> promises he will have [JB] there.

Trial counsel had similar conversations with Mr. Bernstein and
JB on the morning of the expected testimony, in the presence of
the Staff Judge Advocate for III Corps.

Trial counsel's memorandum sets forth the following
sequence of events with respect to JB's testimony.  The bailiff,
after leaving to notify JB that it was time for him to testify,

returned "1 minute later . . . saying that [JB] will not take the stand." Trial counsel asked CPT Henry to talk to Mr. Bernstein and JB. A minute later, the military judge sent the trial counsel on the same mission. Trial counsel went to his office, where he found Mr. Bernstein, JB, CPT Henry, and CS's father. Mr. Bernstein was "irate," complaining that CPT Henry had treated him with disrespect. Concerned that Mr. Bernstein was "trying to provoke CPT Henry," trial counsel asked CPT Henry to leave. At that point, Mr. Bernstein also threatened to leave.

Trial counsel returned to the courtroom to inform the military judge that he was "working on getting the witness to come into court." When the military judge directed a recess, trial counsel responded by saying "no, because when I get [JB] into the courtroom, I want him to testify immediately." The military judge nonetheless ordered the recess, and trial counsel went to his office.

Mr. Bernstein, JB, and trial counsel were in trial counsel's office when the military judge entered "in his Class B uniform." In his statement to the MPs, trial counsel noted that the civilian defense counsel, Mr. Carlson, "might have been just outside my door."

The military judge, who apparently did not identify himself to the civilians in the room, asked if JB was going to testify.  According to trial counsel's statement to the MPs,

> Bernstein responded with his belief that no one can force [JB] to testify, and the two of them could just leave if they wanted to. COL Hodges keeps asking Bernstein to be quiet and let him speak.  Bernstein kept talking over COL Hodges.

Whereas the military judge's memorandum indicated that the military judge had immediately informed Mr. Bernstein of his judicial position, trial counsel's memorandum indicates that the military judge -- who was not in his judicial robes -- had not made his status known to Bernstein and JB during his initial communications with Mr. Bernstein and JB.  Trial counsel's statement notes that

> Bernstein finally asked who COL Hodges was. COL Hodges told him he was the judge. Bernstein quickly sat down and COL Hodges told them that there would be no other opportunity for them to testify, because the trial was the only shot for the government and the defense.

Mr. Bernstein did not find this response satisfactory, which led to "an exchange of words, in a heated state on the behalf of both COL Hodges and Bernstein."

During this confrontation, "Bernstein shot up off the couch and demanded to know if he had to testify."  The military judge "patted Bernstein on the shoulder and told him to calm down."

95

On the issue of whether JB was required to testify, trial counsel's statement indicates that the military judge stated JB would have to testify regardless of whether there was a subpoena:

> COL Hodges said yes, [JB] had to testify. Bernstein then became irate again, and asked why since he had no su[b]poena. COL Hodges stated that it was his courtroom, and [JB] would testify.

The situation then became even more intense:

> Bernstein stated that neither he [n]or [JB] had to testify, and that he had spoken with LTG Schwartz. At this point COL Hodges' face turned beet red and I could see he was very upset.

The military judge "told Bernstein he didn't care about the General," and the incident moved towards its conclusion:

> After a few more words from COL Hodges, COL Hodges pointed his finger at Bernstein's face and stated he (Bernstein) would be in the courtroom in one minute. COL Hodges then looked at me on his way out and told me to call the military police.

In response to follow-up questioning during the MP investigation, trial counsel provided additional details:

> Q. [D]id COL Hodges come into your office and state the following to [JB], "If you don't get your f***ing a** in the court room in one minute, I'll find you in contempt of court and call the MPs?"
>
> A. No, not to [JB].

* * *

96

Q. [D]id COL Hodges make a similar comment to Bernstein?

A. Yes.

Q. What was it that COL Hodges stated to Bernstein, while in your office, that was with regard to being in contempt of court?

A. It was something to the effect of, "I'm about to hold you in contempt of court, you (Bernstein) be in my court in one minute....

### 3. THE DEFENSE COUNSEL

In his appellate affidavit, Mr. Carlson stated that he "remained in the courtroom" during trial breaks, that he was never in trial counsel's office during trial, and that he was not present in trial counsel's office "for any of the events that transpired between Col Hodges and Mr. Bernstein."

### 4. THE BAILIFF

The statements provided by the bailiff, on the other hand, describe a much more benign situation.  After noting the interchange between the military judge and Mr. Bernstein concerning LTG Schwartz, the bailiff's statement notes:

Judge Hodges began to talk to [JB].  At this point, Bill Bernstein walked around CPT Schwind's desk where Judge Hodges, [JB], and myself were standing.  Judge Hodges put his hand on Bill Bernstein's shoulder and said, "Let me show you what 30 years['] experience can do."

97

The statement notes that the military judge asked JB "if he wanted this situation over with this week or a couple of months." JB said he wanted it to be over "this week," and the military judge told him it would be resolved "this week."

According to the bailiff, Mr. Bernstein expressed concern that JB "was timid and the defense would get to him." The military judge asked JB to consider whether, if his parents were on trial, he would want the defense to do the best job possible. JB agreed, and "stated that he would testify." The military judge said that "he only wanted everyone to have a fair chance." At that point, they returned to the court room and JB testified.

The bailiff stated that the incident was observed by "Col. Hodges, Bill Bernstein, [JB], and myself." He added that the door was closed. In response to the investigator's questions, he said that the military judge did not "use any profanity, . . . make any provoking gestures, address either Bernstein or [JB] in a hostile unprofessional manner, . . .[or] make reference to either Bernstein or [JB] with regard to being in contempt of court."

## 5. MR. BERNSTEIN AND JB

Mr. Bernstein and JB were in court on August 20. Later that evening, they met with the military police and provided statements that were signed shortly after midnight. Their

statements are somewhat closer to the description of events

provided by the trial counsel than the descriptions provided by

the military judge or the bailiff.

JB's statement notes that the military judge came into the

trial counsel's office and

> told me that I had one f***ing minute to
> come into the court room to testify . . .
> and he told Bill Bernstein to watch your a**
> before he called the M.P.'s on you and the
> judge hit him on the chest about three or
> four times.

In response to questions during the MP investigation, JB

indicated that he had not been under a subpoena, that he was

forced to testify against his will, and that the military judge

made him testify.

Mr. Bernstein provided the following description of the

events leading up to his confrontation with the military judge:

> The judge came out of his chambers and told
> [JB], "If you don't get your f***ing a** in
> the court room in one minute I'll find you
> in contempt of court and call the M.P.'s."
> Then he turned around and looked at me and
> asked me if I was [JB's] father or mother.
> At that time I told him no.  Col. Kenneth
> (sic) Hodges looked at me and asked me who
> the f*** I was.  I told him that I was Mr.
> Bernstein one of the character witnesses.
> Col. Hodges looked at me and said, "Stay the
> f*** out of me and [JB's] business."  Then
> he smacked the left side of my chest four or
> five times with an open hand.  At this time
> I was in so much shock that I didn't know
> what to do.  The judge walked back into his
> chamber and [JB] was threatened to get

> inside of the court room.  Then [JB]
> proceeded to go into the court room.

### E. DESCRIPTION OF AN EX PARTE COMMUNICATION BETWEEN THE MILITARY JUDGE AND TRIAL COUNSEL

As described in Section III.A.5., supra, JB testified on the merits.  Following his testimony, there was an Article 39(a) session to consider an evidentiary matter.  Two minutes after the Article 39(a) session began, the military judge abruptly announced, "We're in recess."  Trial counsel's post-trial memorandum sets forth the following account of events that occurred prior to and during the 39-minute recess -- events that are not reflected in the record.

While JB was testifying, trial counsel received a communication from another attorney that engendered concern about whether Mr. Bernstein would remain and testify at trial.  At that point, trial counsel signed a subpoena and directed that it be given to Mr. Bernstein.

During a break in JB's testimony, trial counsel returned to his office with JB, where Mr. Bernstein was waiting.  In his post-trial memorandum, trial counsel provided a description of the ensuing scene:

> Bernstein is screaming that I "f***ed him"
> by giving him a subpoena. . . . He is
> spraying the words as he's saying them.  I
> explain that I had no choice because he kept
> asking if he had a subpoena.  He is yelling
> that he is now a prisoner on Fort Hood and
> being held against his will.

The discussion then addressed the merits of the allegations
against appellant:

> Bernstein states that he will now testify
> for the Defense, and tell the court that
> everything was made up.

As Mr. Bernstein became even more agitated,

> [h]e says a few more times that I and
> everyone here have "f***ed him."  He throws
> his phone at the ground and I hear a few
> pieces of plastic hit the wall.  He stomps
> two or three times on the phone, breaking
> off the mouthpiece.

The confrontation apparently was so noisy that it drew the
attention of another attorney.  Trial counsel assured the other
attorney that everything was "OK".  Mr. Bernstein then "calms
down, . . . picks up his phone and starts playing with the
shattered lower end, [and] tells me that he has just damaged a
several-hundred-dollar-phone."

Trial counsel returned to the courtroom for the completion
of JB's testimony.  During the break that followed, the military
judge informed trial counsel that Mr. Bernstein had filed an
ethical complaint against the military judge.  This revelation
led to an ex parte discussion between the military judge and
trial counsel about the impact of this development on the
proceedings:

> On my way back in COL H tells me that
> Bernstein had called COL Clervi[14] and made an
> ethical complaint against him, and that we
> will address the allegation with Bernstein
> on the record prior to calling Bernstein as
> a witness.

Trial counsel made it clear that he did not agree with the military judge's approach because of the adverse affect that it might have on the prosecution's case:

> I stop COL H at the rear door to the court
> and ask if we can have Bernstein testify
> first, then address the ethics issue,
> because I am worried that Bernstein may blow
> up on the stand when called on the ethics
> issue.  COL H agrees.

This ex parte conversation was not mentioned by the military judge in his post-trial statement or memorandum, nor was it disclosed on the record at that time or in any of the subsequent sessions concerning this matter.

## F. THE MILITARY JUDGE'S DECISION TO LIMIT DISCLOSURE AT TRIAL

Following the trial, the military judge provided the following explanation of his purpose in calling the Article 39(a) session at which Mr. Bernstein testified about the confrontations:

> The focus of that session was not to defend
> or exonerate me, but to develop whatever
> facts were necessary to allow the parties to
> do what they needed to do.

---

[14] The Chief Circuit Judge, who was the supervisor of the military judge within the trial judiciary.

102

The military judge's memorandum also described an out-of-court conversation that he had with Mr. Bernstein's attorney during the recess called to permit the attorney to meet with Mr. Bernstein:

> After I questioned Mr. Bernstein and before counsel did, Mr. Hewitt -- a Killeen attorney -- asked to consult with "his client," Mr. Bernstein. Though I had seen Mr. Hewitt in the court room and was later told Mr. Hewitt said something about his being there for Mr. Bernstein, I didn't know Mr. Hewitt's role until he asked for the recess. Mr. Hewitt asked if I was going to hold Mr. Bernstein in contempt. I told him I would not -- could not -- because as it turned out, Mr. Bernstein had not interfered with the proceedings.

The military judge also described his impressions of Mr. Bernstein's testimony at the Article 39(a) session:

> Mr. Bernstein apologized to me. It was my impression that Mr. Bernstein, having spoken to his lawyer and having taken a different view during the second [Article 39(a) session] on the matter, that the matter was closed.

Contrary to the military judge's impression of the matter, Bernstein was not mollified, and later that evening he provided the military police with a sworn statement alleging that he had been assaulted by the military judge. In that statement, he provided the following explanation for his cooperative attitude during the proceedings held earlier in the day:

> At that time my lawyer gave me a wink and motioned with his mouth, "be humble." At

> that time I was so scared to death about
> being put into contempt of court I went
> ahead and apologized to the court for the
> actions outside of . . . COL Hodges'
> chambers . . . . COL Hodges said I do not
> need a[n] apology from you but I will look
> over the incident.

Although the military judge was satisfied with Mr. Bernstein's testimony at trial about the confrontations, his memorandum indicates that he later recognized that the record of trial did not provide a complete description of what had happened:

> I am confident that any inquiry will be a
> thorough one but each day passes with my
> learning much more occurred before and since
> my involvement with Mr. Bernstein concerning
> this very situation.

The memorandum, however, does not indicate what facts the military judge had learned since trial. Elsewhere in the memorandum, the military judge recognized that the Article 39(a) session concerning the confrontation could have provided a comprehensive disclosure of the facts:

> While I could have turned the session into
> discovery of what happened between Mr.
> Bernstein and me, I saw that as unnecessary.
> The parties had the facts they wanted and I
> did not wish to insert the other matter
> unnecessarily into the trial.

He added:

> Had I known that the matter wasn't closed
> and Mr. Bernstein somehow really believed he
> had been assaulted, I would have arranged
> for some way to document those facts.

> Documenting those facts was not then
> important to me; the trial was.

As discussed in Part III.A.16., supra, however, it soon became apparent during trial that the matter was not closed when the military judge learned the next morning that Mr. Bernstein filed an assault complaint with the MPs and made a statement to the press. None of the events, however, led the military judge to ensure that the record of trial would "document those facts" about his confrontations with Mr. Bernstein.

## IV. DISCUSSION

Appellant asks this Court to find that the military judge should have disqualified himself, on the military judge's own motion, for creating an appearance of bias under RCM 902(a), or for actual bias under 902(b). Appellant contends that the judge's conduct in regard to Mr. Bernstein created an appearance of bias. He argues that the judge's actions in bringing a reluctant witness to the stand and subsequently "us[ing] the court-martial proceedings to minimize and rationalize his conduct" demonstrate actual bias. Finally, appellant claims that the judge's knowledge of the underlying facts about the confrontation made him a witness when the issue came into evidence via the stipulation of fact.

105

In response, the Government contends that appellant waived the appearance of bias issue under RCM 902(a), noting that on at least four occasions, defense counsel either expressly stated that he had no challenge to make against the judge or turned down the opportunity to question the judge. With respect to actual bias under 902(b), the Government takes the position that there is no evidence of bias against appellant in the record and no evidence that the judge gained knowledge about the proceedings from an extra-judicial source. The Government further argues that the agreement of the parties to enter into a stipulation of fact regarding the out-of-court events vitiated the possibility that the judge would become a witness.

We review a judge's decision on disqualification for an abuse of discretion. United States v. Norfleet, 53 MJ 262, 270 (2000).

## A. WAIVER UNDER RCM 902(e)

RCM 902(a) provides that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." This is the only basis for disqualification that may be waived by a party, provided that the waiver is "preceded by a full disclosure on the record of the basis for disqualification." RCM 902(e).

In this case, the post-trial filings indicate that the military judge did not fully disclose the events that could reasonably raise a question about his impartiality. Foremost, as noted in Section III.E., supra, the military judge never disclosed the ex parte conversation described in trial counsel's affidavit, which states that the military judge acceded to trial counsel's request to allow Mr. Bernstein to testify on the merits before taking up the issue of the out-of-court confrontations and Mr. Bernstein's complaint about the judge. Although the judge's initial reaction was to disclose his confrontations with Mr. Bernstein on the record immediately after learning of the complaint, the trial counsel's memorandum states that the military judge agreed when trial counsel expressed fear that such an approach could detonate Mr. Bernstein's volatile personality and spoil the prosecution's case.

This matter was not revealed to defense counsel at trial and only came to light when appellant obtained trial counsel's memorandum two years later. Although the decision on how to proceed with Mr. Bernstein ultimately rested with the military judge, defense counsel was entitled to be informed of developments involving an adverse witness and to engage in a discussion about the timing of Mr. Bernstein's testimony on the

merits versus the confrontations, given that the order of such testimony was clearly a strategic point for the prosecution.

There are other lapses in the record that make it impossible to find full disclosure for purposes of RCM 902(a). The military judge failed to fulfill his fundamental responsibility to ensure that the record of trial set forth a complete account of the out-of-court events bearing upon his actions and the issue of judicial impartiality. In his memorandum, the military judge acknowledges that he did not provide a complete description of his confrontations with Mr. Bernstein because he hoped that those events would not become an issue at trial. See Section III.F., supra. To the extent that elements of the out-of-court events were placed on the record, it is difficult to determine precisely what happened during the confrontations between the military judge and Mr. Bernstein. This is primarily the result of the military judge's failure to provide a coherent description of the events on the record, preferring instead to place Mr. Bernstein on the stand in an Article 39(a) session and question him about the episodes in a manner that minimized the disclosure of information about the events. When the military judge learned that Mr. Bernstein had filed a complaint about their out-of-court confrontations, it was the judge's responsibility to provide a complete and coherent description of the events on the record.

If the military judge had made a timely and full disclosure and allowed the parties to decide whether to waive the disqualification in accordance with the procedure in Canon 3D of the Code of Conduct for United States Judges, or a legally sufficient alternative procedure, the record have could fully documented any waiver.

Because the military judge did not ensure that the record reflected a full disclosure as required by RCM 902(e) -- a condition that must precede waiver of disqualification for the appearance of bias -- it would be inappropriate to conclude on the present state of the record that the defense counsel waived the issue of disqualification in this case.[15] See generally Potashnick v. Port City Construction Co., 609 F.2d 1101, 1115 (5th Cir.), cert. denied, 449 U.S. 820 (1980)(the parties' request for the judge to preside over the trial did not constitute waiver and preclude appellate review of disqualification under 28 USC § 455(a) because the judge's disclosure of a potential source of bias did not reveal all bases for challenge); Barksdale v. Emerick, 853 F.2d 1359, 1361-

---

[15] By the end of the trial, defense counsel comprehended sufficient details about Mr. Bernstein's conflicts with the judge to use the events as part of his effort to discredit the witness by putting the matter before the members in a stipulation of fact. As the Eleventh Circuit has noted, "a recusal issue may not be abused as an element of trial strategy" in which a party refuses to raise the issue until after an adverse ruling on the merits. Kelly, 888 F.2d at 746. In the present case, however, the incomplete and confusing record, particularly regarding the ex parte conversation between the military judge and trial counsel, precludes us from concluding that defense counsel's advancement of the stipulation constituted waiver.

62 (6th Cir. 1988)(refusing to find waiver when full disclosure of potential basis for disqualification was not on record).

## B. APPEARANCE OF BIAS UNDER RCM 902(a)

"Any conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's 'impartiality might reasonably be questioned' is a basis for the judge's disqualification." United States v. Kincheloe, 14 MJ 40, 50 (CMA 1982) (quoting E. Thode, Reporter's Notes to Code of Judicial Conduct 60 (1973)); Wright, 52 MJ at 141.  In this case, the military judge committed several acts that would reasonably put his impartiality into doubt.  "When a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt" by the military judge's actions.  United States v. Burton, 52 MJ 223, 226 (2000) (citations and internal quotation marks omitted).  On appeal, "[t]he test is objective, judged from the standpoint of a reasonable person observing the proceedings."  Id.

### 1. IMPACT ON THE PRODUCTION OF A WITNESS (JB)

The military judge erred by interjecting himself into the problem of JB's failure to appear without first ascertaining the facts.  He took the unusual step of leaving the bench during a trial and engaged in out-of-court, off-the-record actions:

(1) without first determining whether the trial counsel was unable to fulfill his responsibilities under RCM 703(c)(1) to produce the witness, and (2) without the involvement of both parties to the court-martial.  By not inquiring, the military judge erroneously assumed that the witness had been issued a subpoena.  That mistaken belief not only led to the confrontation with Mr. Bernstein, but also appears to have contributed greatly to the animosity exhibited during the episode.

Although it is appropriate for a military judge to play an active role in promoting the efficiency of a trial, the judge in this case did not even ask trial counsel for an explanation of what had transpired or whether help was needed.  Indeed, the judge's action appears to have been contrary to trial counsel's wishes at the time.  See Section III.A.4., supra.  The military judge acknowledged in his post-trial memorandum that he erred by involving himself in the question of JB's availability when that matter was the responsibility of the trial counsel. See Section III.D.1., supra.

### 2. FAILURE TO ENSURE THAT THERE WAS FULL DISCLOSURE AND A COHERENT RECORD OF THE OUT-OF-COURT CONFRONTATIONS

As discussed in the previous section on waiver, the military judge failed to put forth a clear, coherent, and complete record of his out-of-court actions and acknowledged

that he did not do so because he did not think that the confrontations with the witness would become an issue at trial: "I saw that [full disclosure of confrontations] then as unnecessary. . . . Had I known that the matter wasn't closed . . . I would have arranged for some way to document those facts." The fact that the judge failed to perform his duty to fully disclose the events on the record after the events clearly became an issue at trial could cause a reasonable person to question the judge's impartiality in the proceedings.

Contrary to the judge's hopes, his confrontation with Mr. Bernstein became a central issue at trial, and his failure to personally describe what occurred out-of-court makes it difficult to determine exactly what happened.  The ambiguity flows from many sources.

First, the record contains numerous discussions between the military judge and various spectators in the courtroom, none of whom were sworn as witnesses.  Often, these discussions contain cryptic and incomplete references to persons whose duties and relationship to the proceedings are not defined, as well as references to events not described in the record.  The military judge failed to ensure that the reader of the record would have an understanding of the significance and context of these discussions.

Second, the military judge's interaction with witnesses and counsel was marked by numerous interruptions, incomplete sentences, and references to persons and events whose significance was not explained.

Third, the record reflects at least one off-the-record session under RCM 802 touching on these issues, the substance of which was not adequately summarized in the record.

Fourth, the record also includes vague references to a variety of out-of-court developments with incomplete information as to context and little or no indication as to the source of the information, or whether the information came from, or was shared with, counsel.

Fifth, the record regarding trial counsel's motion to recuse the military judge and trial counsel's announcement of the prosecution's intent to submit an interlocutory appeal of the military judge's denial of that motion is unclear.  The record describes the military judge's views about whether the denial could be appealed, as well as the military judge's various conversations with a spectator (CPT Henry), rather than trial counsel, about the appeal.  Much of the conversation is difficult to follow and the record contains no indication of how the matter was resolved, but simply leaves an inference that the Government decided not to submit an interlocutory appeal.  Cf. Art. 62, UCMJ, 10 USC § 862 (appeal by the United States).

Finally, assuming the accuracy of trial counsel's memorandum, the military judge failed to disclose an <u>ex</u> <u>parte</u> conversation with trial counsel about the timing of Mr. Bernstein's testimony on the merits.[16]  This discussion cannot be minimized or dismissed as merely an administrative decision. The judge's confrontations with Mr. Bernstein, and Mr. Bernstein's credibility, became central issues at trial.  The judge himself repeatedly emphasized Mr. Bernstein's role in the defense case and described him as the prosecution's "achilles heel."  Later in the trial, when the defense proposed a stipulation of fact regarding the out-of-court confrontations, the military judge expressly ruled that those events were relevant on the merits.

<u>Ex</u> <u>parte</u> contact with counsel does not necessitate recusal under RCM 902(a), particularly if the record shows that the communication did not involve substantive issues or evidence favoritism for one side.  <u>Alis</u>, 47 MJ at 817; <u>In re Federal Skywalk Cases</u>, 680 F.2d 1175 (8th Cir. 1982).  However, an <u>ex</u> <u>parte</u> communication "which might have the effect or give the appearance of granting undue advantage to one party" cannot be

---

[16] Another disclosure problem is set forth in trial counsel's memorandum, where he describes Mr. Bernstein's explosion of temper in his office and Mr. Bernstein's announcement that he would testify for the defense that everything "was made-up."  This incident was never disclosed to the defense during trial, and it directly preceded trial counsel's <u>ex</u> <u>parte</u> conversation with the judge.  The statement forms the basis for appellant's claim in Issue V that the Government failed to disclose material, exculpatory evidence. We address this matter in our remand in Section IV.C., <u>infra</u>.

114

condoned.  United States v. Wilkerson, 1 MJ 56, 57 n.1 (CMA 1975).

The failure to provide for complete disclosure created two major problems.  First, the absence of such disclosure deprived the parties of an adequate foundation for their decisions on whether or not to request recusal.  Second, a complete disclosure could have made it more likely that the military judge would have clearly identified and considered those facts crucial to determining whether there was a conflict or appearance of conflict requiring disqualification.

3. IMPACT ON THE CONTENT OF THE STIPULATION

The entanglement of the military judge's actions with substantive issues at trial deepened with the stipulation of fact advanced by the defense.  Near the end of trial, defense counsel moved to put the details of the military judge's confrontations with Mr. Bernstein before the members via a stipulation of fact.  The stipulation described events fully known to only two or three persons (the military judge, Mr. Bernstein, and JB) and partially known by others (trial counsel and the bailiff).  The purpose of the stipulation was to contrast Mr. Bernstein's conciliatory, in-court testimony about the events with his subsequent complaints, placing a comparison

of the judge's credibility with Mr. Bernstein's credibility directly before the members.

The prosecution would not agree to the stipulation, arguing that the out-of-court events were not relevant to the merits. Trial counsel immediately recognized that the stipulation would impermissibly put the military judge in the position of being a witness in the proceedings -- since he was one of the few people with direct and complete knowledge about the events -- regardless of whether the stipulation was titled as one of "fact" rather than "testimony."

The military judge urged the trial counsel to accept the stipulation, noting that his only alternative was to bring Mr. Bernstein to the stand to testify about the events.  As for being a witness, the judge erroneously told trial counsel that if he (the judge) stepped down, the Government would face a mistrial and possible operation of double jeopardy.  However, if the judge had disqualified himself at this point because he was becoming involved as a witness, another military judge could have been assigned and the proceedings could have continued. The stipulation was admitted into evidence after the judge further involved himself by editing it and suggesting changes to the parties.

The military judge's continued participation in the case, after the development of a stipulation that relied extensively

116

on the judge's personal knowledge of out-of-court events and that placed the judge's stature and credibility in contest with the credibility of a witness, clearly raised questions about his impartiality under RCM 902(a).

## 4. CONCLUSION

As outlined above, several actions by the military judge created an appearance of bias under RCM 902(a). In light of the military judge's failure to provide full disclosure on the record, the moment at which he first should have disqualified himself cannot be precisely identified, but it became necessary when defense counsel announced that he was going to make the confrontations between the judge and Mr. Bernstein an issue on the merits with respect to Mr. Bernstein's credibility. At the very least, the judge should have disqualified himself when the stipulation was presented and the judge found himself in the midst of negotiations that would: (1) determine how complete a description of the confrontations should be made, under circumstances where he had personal knowledge of events not known to either party; and (2) adversely reflect on his own professional conduct.

Had the military judge made a full disclosure at the outset, the facts therein might have led him to announce a disqualification, at which point, under applicable law, the

117

parties could have proceeded with a new judge, or they could have expressly waived the disqualification as provided by RCM 902(e).

## C. REMEDY

A conclusion that a judge should have disqualified himself or herself does not end appellate review. Neither RCM 902(a) nor applicable federal, civilian standards mandate a particular remedy for situations in which an appellate court determines that a judge should have removed himself or herself from a case. See, e.g., Liljeberg, 486 U.S. at 862 ("There need not be a draconian remedy for every violation of § 455(a)."). In Liljeberg, the Court established a three-part test for determining whether reversal of a decision should be granted as a remedy when a judge has failed to recognize that his or her disqualification was required because the judge's impartiality might reasonably be questioned:

> We conclude that . . . it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice.

Id. at 864 (internal citations and quotations omitted).

118

The military judge's incomplete disclosures and ex parte conversation appear to have prejudiced appellant.  However, we cannot apply the Liljeberg test with any certainty in this case because the state of the record makes it impossible to determine:  (1) what actually happened between the military judge and Mr. Bernstein; (2) precisely what defense counsel knew about the confrontations while the trial was ongoing; and (3) what impact these events had on the entire trial.  Likewise, although trial counsel described the ex parte conversation and Mr. Bernstein's threat to testify for the defense, the impact of these occurrences is also unclear.

The post-trial filings and affidavits considered by the court below do not clarify these issues because they also contain gaps and inconsistencies.  For example, there are great disparities between trial counsel's negative description of the military judge's actions during the out-of-court events (aggressive, confrontational, profane, and unaware that JB had not been subpoenaed), the descriptions placed on the record during the Article 39(a) session, and the descriptions in the judge's post-trial statement and memorandum.

There are also disparities in the record as to whether defense counsel observed any of the out-of-court interactions between the military judge and Mr. Bernstein.  The documents prepared by the various attorneys in the course of the post-

119

trial reviews reflect inconsistent descriptions of what transpired at trial as well.

In light of these difficulties with the record, we remand this case for further proceedings in accordance with this opinion and United States v. DuBay, 17 USCMA 147, 37 CMR 411 (1967). There, the record can be fully developed as to: (1) what actually happened in the confrontations between the military judge and Mr. Bernstein; (2) what transpired in the ex parte conversation; (3) the nature and significance of Mr. Bernstein's alleged threat to testify for the defense; (4) what details defense counsel knew at trial about these occurrences; and (5) whether these occurrences affected the trial and charges involving RW.

We note that our remand does not include the charges involving the military victims. Mr. Bernstein had no relationship with the military victims, he did not influence them to report the incidents, and he did not testify on the merits with respect to those charges. Likewise, the defense did not clearly link the confrontations between the military judge and Mr. Bernstein to the validity of the charges concerning the military victims.

PART B.  LEGAL SUFFICIENCY OF THE EVIDENCE,
INSTRUCTIONS, AND EXPERT TESTIMONY

I.  LEGAL SUFFICIENCY OF THE EVIDENCE SUPPORTING THE CHARGE OF
FORCIBLE SODOMY (ADDITIONAL CHARGE I)

A. BACKGROUND

Appellant was convicted of committing forcible sodomy upon RW, a civilian teenager under the age of 16 at the time of the alleged crime, and challenges the legal sufficiency of the evidence for this conviction on appeal (Granted Issue III).  The testimony of the victim provided the only evidence of the alleged sexual contact.  RW testified to the following chronology of events on the night in question:  RW went to the movies with appellant, after which he returned to appellant's house and fell asleep.  In the morning, while RW was in the process of awakening, appellant began massaging his back, and then his stomach.  Appellant then unzipped RW's pants and began to fondle RW's genitals.

According to RW's testimony, he often had difficulty waking up, and he was struggling to awaken during these events.  However, once appellant had partially removed RW's pants to expose his penis, he asked appellant what he was doing.  Appellant did not respond, but put one hand on RW's upper leg and the other on his stomach and proceeded to orally sodomize him for approximately 30 seconds.  RW testified that he was initially shocked by the oral contact, but that once he fully

realized what was happening, he pushed appellant away and ran to the bathroom.

At conference, the Government requested that the members be instructed on:  (1) incapacity to consent due to sleepiness; and (2) the victim's tender years as possible explanations for the victim's initial lack of response to the sexual contact.  The judge issued the requested instructions, and appellant did not object to the instructions given.

## B. DISCUSSION

The test for the legal sufficiency of evidence to support a finding of guilty is whether, when the evidence is viewed in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Particularly in light of the military judge's instructions on tender years and incapacity due to sleepiness, a rational factfinder could reasonably have determined on the basis of the evidence introduced at trial that the sexual contact described by RW occurred without his consent while he was in the process of awakening, and that he took steps to terminate the contact once he became aware of it.  Similarly, the force used by appellant to make contact under these

circumstances was sufficient to support the charge of forcible sodomy.


## II. FINDINGS INSTRUCTIONS

### A. BACKGROUND

Appellant claims on appeal that prejudicial errors occurred in the findings instructions issued by the military judge (Granted Issue IV).  A summary of the facts surrounding the findings instructions follows.

During an Article 39(a) session following the close of findings arguments by the parties, extensive debate ensued with regard to the appropriate content of the instructions to be presented to the members before deliberations.  The military judge showed the parties an outline of instructions that he had prepared and informed the parties of his intent to distribute a copy of the outline to each member at the time of oral instructions.

Defense counsel objected to the outline, arguing that it was confusing and that the members should be required to rely on their own notes.  The military judge overruled the objection and proceeded to issue the outline to each member immediately prior to giving the oral instructions.  He advised that his oral instructions would govern in the event of a conflict with the written instructions.

The written outline and the oral instructions initially given were flawed in the following respects: (1) the military judge erroneously instructed the members that constructive force could constitute the requisite force to commit forcible sodomy on RW; (2) the members were instructed that the law given regarding force for the forcible sodomy specification applied equally to the indecent assault specification; (3) the instructions erroneously omitted the mistake-of-fact defense with respect to the charge of forcible sodomy of RW; and (4) the instructions erroneously omitted the tender-years instruction for the specification concerning RW.

After the military judge issued the oral instructions, trial counsel called the military judge's attention to the exclusion of the tender-years instruction. The military judge immediately added the omitted instruction.

Following Government and defense arguments on findings, the military judge observed that he had erroneously failed to instruct the members on the defense of mistake of fact. He then proceeded to give the omitted instruction to the members.

After approximately two hours of deliberation, the members returned with a request for clarification of the force element of the indecent assault specification. The military judge called to the members' attention the incorrect, written instructions and proceeded to re-deliver the incorrect, oral

instructions, erroneously informing the members once again that the requirement of constructive or actual force for a rape or forcible sodomy charge was equally applicable to indecent assault.

The trial counsel then pointed out the error in the indecent assault instruction.  Over defense objection, the military judge recalled the members to inform them of the mistake and to issue correct instructions.  He repeatedly emphasized the significance of his error, asked them to cross out the incorrect information on the written outline and write in the Benchbook[17] definition of force for indecent assault, and orally delivered the standard instruction.  He then asked the members whether they were clear on the mistake and its remedy, and the members agreed that they understood.  They recommended deliberations for approximately 45 minutes and returned with a verdict.

## B. DISCUSSION

The propriety of the instructions given by a military judge is reviewed de novo.  United States v. Maxwell, 45 MJ 406, 424 (1996).

The military judge initially delivered incorrect instructions on the law in this case.  Had he failed to correct

---

[17] Military Judges' Benchbook, Department of the Army Pamphlet 27-9 (1 May 1982).

them, or even succeeded in correcting them but neglected to clearly withdraw the earlier instructions, reversal would be required. United States v. Truman, 19 USCMA 504, 507, 42 CMR 106, 109 (1970) ("Later correct instructions do not remedy the defect in the absence of a clearly shown withdrawal of the first erroneous instructions."). However, the military judge clearly retracted and then corrected these errors. All of the necessary instructions were ultimately given in this case. The members were repeatedly advised of the significance of the military judge's longest-lingering instructional error with respect to the indecent assault charge, and they indicated that they understood the mistake and the correction. A panel is presumed to understand and follow the instructions of the military judge absent competent evidence to the contrary. Loving, 41 MJ at 235.

This case is distinguishable from United States v. Curry, 38 MJ 77 (CMA 1993), a case in which the military judge did not ultimately correct his error by issuing appropriate instructions. Although the instructions in this complex case were not presented in the most organized or coherent fashion possible, under these circumstances the military judge did not abuse his discretion in the overall manner in which the instructions were delivered.

Even had there been abuse of discretion by the military judge here, appellant would have suffered no prejudice, as the effect of the military judge's instructional error was that members deliberated for over an hour under an instruction more favorable to appellant than the proper instruction to which he was entitled.

## III.  ADMISSION OF EXPERT WITNESS TESTIMONY

### A. BACKGROUND

The three teenage victims delayed reporting the incidents for time periods ranging from a week to more than a month.  The Government offered an expert, Mr. Emerick, to testify on the subject of delayed reporting of sexual assaults by victims of abuse.

In laying a foundation for the relevance and reliability of Mr. Emerick's testimony and qualifying him as an expert, the Government introduced testimony from the witness with respect to his credentials.  According to his testimony, the witness had a bachelor's degree in psychology and a master's degree in "guidance in counseling," and had completed three-fourths of a doctoral degree.  He had specialized in the treatment and risk assessment of sex offenders, and in the treatment of victims of sexual abuse for 16 years.  Approximately two-thirds of his practice was devoted to working with sex offenders, with the

127

remainder spent treating victims.  He estimated that he had
evaluated or treated approximately 1,000 survivors of sexual
abuse.

The witness further testified that he had presented seven
or eight major papers in this field and had published two
articles.  He had taught at several universities and lectured at
several specialized professional programs.  His experience in
assessment and treatment of perpetrators and victims of sexual
abuse included work in Canada and in the United States.  With
respect to his qualification as an expert, the witness offered
that, on over 100 previous occasions, he had testified in court
as an expert in the field of sexual abuse.

Citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
U.S. 579 (1993), defense counsel challenged Mr. Emerick's
credentials as a witness and indicated an intent to question him
about the potential rate of error and general acceptance of the
studies upon which he was relying.  The military judge then made
the following statement:  "Okay.  However, that doesn't go to
his qualifications, it goes to how good his opinion is or not.
I mean, do you really think that I'm qualified to say whether or
not his answer is correct or not?"  Defense counsel responded
that, under Daubert, it was the responsibility of the trial
judge to make a determination based on the factors enumerated in

that case.  The military judge replied, "I know Daubert….  But what we're going to do is we're going to focus on M.R.E. 701."

During voir dire, defense counsel elicited additional information:  (1) in one trial in which Mr. Emerick had been qualified as an expert, an appellate state court later overruled that qualification and stated that his credentials were insufficient to qualify him as an expert; (2) Mr. Emerick's testimony would be predicated not on a single study, but on a compilation of studies from the relevant literature; (3) these studies did not indicate known rates of error; (4) he did not know the sizes of the groups for the studies upon which he was relying; and (5) at one time, Mr. Emerick was prohibited from conducting tests in the state of Arizona due to charges of unethical practices.  The evidence also indicated that he continued to practice in Arizona at the time of appellant's trial, had never been convicted of any offense related to conduct of his practice, and that his license had never been revoked due to the nature or quality of his work.

The military judge then questioned Mr. Emerick, and further information was developed to indicate that the principles upon which he would rely in testifying were valid and generally accepted in the scientific community, and the articles which would constitute a partial basis for his testimony had not, to his knowledge, been discredited.  The military judge

accepted Mr. Emerick as an expert in "the treatment of both sexual offenders and those stated to be victims of the same."

## B. DISCUSSION

Admission of opinion testimony by an expert in a court-martial is governed by Mil. R. Evid. 702, which requires qualification of the expert "by knowledge, skill, experience, training, or education." In Daubert, the Supreme Court held that a trial judge is required to make a preliminary assessment of whether the reasoning or methodology underlying the expert's testimony is scientifically sound, and whether that reasoning or methodology properly applies to the facts at issue. 509 U.S. at 592-93. Subsequently, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court held that Daubert applies not only to expert testimony based upon "scientific" knowledge, but also to "technical" and "other specialized" knowledge covered by Fed. R. Evid. 702. Id. at 146. The Court noted that the trial judge has a "gatekeeping function" in these inquiries to "ensure that any and all . . . [expert] testimony . . . is not only relevant, but reliable." Id. at 147.

The rules of evidence provide expert witnesses with testimonial latitude broader than other witnesses on the theory "that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Id. at 148. In

some cases, the reliability determination focuses on the expert's qualifications to render the opinion in question. See id. at 151. In others, it might center on the factual basis or data that give rise to the opinion. See id. at 149, 151. Daubert and Kumho Tire were aimed at ensuring the overall reliability of the evidence, including any information used to form the basis for an opinion.

The Court articulated a number of factors in Daubert which can be useful to consider in reaching such a determination with respect to a given theory or technique, including whether it can be tested, whether it has been subjected to peer review, its known or potential rate of error, and its general acceptance in the scientific community. 509 U.S. at 594-95.

In the present case, some initial comments by the military judge suggest that he did not plan to apply the appropriate analysis under Daubert, and that he intended to rely on Mil. R. Evid. 702 alone. However, in its totality, the record demonstrates that he ultimately undertook the appropriate considerations as provided in Daubert. Moreover, the scientific principles to which the witness was called to testify — namely, general theories explaining the tendency of victims of sexual abuse to delay reporting incidents of assault — were not particularly novel or controversial.

Appellant did not challenge the relevance of the witness's testimony. Mr. Emerick testified that his opinions in this case were based both on his own experience and on an overview of analytical studies in the field. He testified that: (1) the studies he relied upon were peer-reviewed; (2) the rates of error were reported in the studies, but he presently lacked recall of the rates for each study; (3) the studies were scientifically valid, had not been repudiated, and were generally accepted within the scientific community; and (4) he still retained licenses to practice and had personal experience treating victims of sexual abuse. On this record, the military judge did not abuse his discretion in qualifying this witness as an expert and admitting his testimony under Daubert and MRE 702.

## PART C. CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed with respect to specifications 1 and 3 of Charge II but set aside with respect to Additional Charge I and the sentence. The record of trial is returned to the Judge Advocate General of the Army for further DuBay proceedings to address the issues set forth in Section A.IV.C. of this opinion. After such proceedings are concluded, the record of trial, along with the military judge's findings of fact and conclusions of law, will be returned to the Court of Criminal Appeals for

further review under Article 66(c), UCMJ, 10 USC § 866(c).

Should that court conclude that the events affected the charge

involving RW in a manner prejudicial to appellant, Additional

Charge I and its specification shall be dismissed and a

rehearing on sentence shall be ordered. Should that court

conclude that the events did not affect the charge involving RW

in a manner prejudicial to appellant, it may again affirm the

findings with respect to Additional Charge I and its

specification, and the sentence. Thereafter, Article 67, UCMJ,

10 USC § 867, shall apply.

Alternatively, if the Judge Advocate General determines

that it is not practicable to conduct a Dubay hearing,

Additional Charge I and its specification shall be dismissed and

a rehearing on sentence shall be ordered.

SULLIVAN, Senior Judge (concurring in part and dissenting in part):

I would affirm the findings and sentence in this case.  I agree with the majority opinion regarding the sufficiency-of-evidence question (Issue III) and the admission of the expert witness's testimony (Issue VI).  However, I disagree with the majority's handling of the disqualification issues (Issues I and II).  In my view, the military judge did not err by choosing not to disqualify himself, nor did the Army Court err by affirming that decision.  Additionally, the erroneous instruction (Issue IV) did not constitute plain error, and the "exculpatory" evidence (Issue V) was not material.

In assessing whether the judge should have recused himself under RCM 902(a), Manual for Courts-Martial, United States (1995 ed.), the majority claims that the judge's behavior in this case put the court-martial's "legality, fairness, and impartiality" in doubt.  __ MJ at (110).  I agree that the military judge behaved inappropriately in this case by interjecting himself into a dispute with the witnesses; however, appellant has not shown any prejudice with respect to the offenses for which he was convicted.  See Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 862 (1988)(examining violations of the federal recusal statute, 28 USC § 455(a), for harmless error); see also Article 59(a), UCMJ, 10 USC § 859(a).  As the lower court

<u>United States v. Quintanilla</u>, No. 00-0499/AR

recognized, the judge's confrontation with Mr. Bernstein "played

directly into the defense's theory" that Bernstein was a

"manipulator." See <u>United States v. Quintanilla</u>, 52 MJ 839, 855

(Army Ct. Crim. App. 2000). More importantly, <u>appellant was</u>

<u>found not guilty of the offenses against the two civilians</u> whom

Mr. Bernstein was supporting at this court-martial.


Finally, although the majority did not resolve it, I would

face the issue of whether the Government's failure to disclose a

potentially exculpatory statement violated appellant's due

process rights (Issue V). According to the Supreme Court,

"[government suppression of] evidence favorable to an accused

upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith

or bad faith of the prosecution." <u>Brady v. Maryland</u>, 373 U.S.

83, 87 (1963); <u>see</u> <u>also</u> RCM 701(a)(6). In order to comply with

the materiality component of the <u>Brady</u> doctrine, the Supreme

Court examines whether "the favorable evidence could reasonably

be taken to put the whole case in such a different light as to

undermine confidence in the verdict." <u>Strickler v. Greene</u>, 527

U.S. 263, 290 (1999) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435

(1995)); <u>see</u> <u>also</u> <u>United States v. Williams</u>, 50 MJ 436, 440

(1999). At issue in this case is a statement made by Mr.

Bernstein, a government witness, upon learning that he had been

subpoenaed, that he would "testify for the defense, and tell the

court everything was made up." Defense Appellate Exhibit E.

The failure to disclose Mr. Bernstein's statement was not material, as I show below, and would not "undermine confidence in the verdict." See Strickler, supra. Assuming arguendo that Bernstein had indeed invented the entirety of his testimony, his fabrications would not have affected the credibility of the victims. First of all, Mr. Bernstein had no connection with the two military victims. Also, appellant was acquitted of the charges involving two civilian victims, Bennett and Sweeney, supposedly in Mr. Bernstein's "control." While appellant was convicted of charges related to the third civilian victim, Welton, Mr. Bernstein had minimal contact with him; Welton discussed the allegations with his father, never with Mr. Bernstein. See Quintanilla, 52 MJ at 841.